Joseph C. SCHULTZ and
Kristen M. Harkum

v.

Christopher BRAGA, et al.

Civ. Nos. JFM–03–556, JFM–03–562.

United States District Court,
D. Maryland.

Nov. 13, 2003.

Arnold M. Weiner, Barry L. Gogel, Robert J. Weltchek, Weiner and Weltchek, Lutherville, MD, Robert S. Campbell, Steven A. Allen, Hodes, Ulman, Pessin and Katz, PA, Towson, MD, for Consol Plaintiffs.

Andrew C. White, Law Offices of Andrew C. White, Susan Q. Amiot, Susan Q. Amiot, Attorney at Law, John Augustine Bourgeois, Kramon and Graham, PA, Baltimore, MD, Vicki L. Dexter, Irwin, Green and Dexter, LLP, Towson, MD, for Defendants.

## OPINION

MOTZ, District Judge.

Plaintiffs Joseph C. Shultz and Kristen M. Harkum have brought these suits against Defendant FBI Agents Christopher Braga, Henry F. Hanburger, and Lawrence S. Brosnan for violation of their Fourth Amendment rights against unlawful search and seizure.[1] Plaintiffs have

---

1. The two suits have been consolidated for all purposes. The allegations in the two complaints are virtually identical.

asserted their claims under *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleging that defendants are liable for mistakenly seizing plaintiffs without probable cause. Plaintiffs further claim that Defendant Braga violated Plaintiff Schultz's right against excessive force when Braga shot Schultz, mistaking him for a suspected bank robber. Now pending before me are defendants' motions to dismiss all of plaintiffs' claims on the ground of qualified immunity. Defendant Braga has also filed a motion to strike certain portions of the complaints.

## I.

This case arises out of the mistaken shooting of an innocent person by FBI agents in pursuit of a known felon.[2] On February 20, 2002, Ryan Grimes robbed an Allfirst Bank branch located in Pasadena, Maryland, and escaped the scene in a getaway vehicle driven by Michael Blottenberger. Six days later, Timothy King called the Anne Arundel County Police Department and reported that Grimes and Blottenberger had committed the crime. Blottenberger lived in the basement of King's home and worked for the same paint contractor as King. Detective Michael Calvert passed the information on to Defendant Lawrence S. Brosnan, a Special Agent of the FBI assigned to the Annapolis Resident Agency of the Baltimore Division of the FBI, who was the FBI Case Agent for the robbery investigation. Agent Brosnan has been a Special Agent since 1978. Until 1997, he was a Senior Special Weapons and Tactics ("SWAT") Team leader of the Baltimore Division SWAT Team, and since 1992, he was as-signed primarily to bank robbery and other violent crimes.

Over the next three days, King and Brosnan kept in close contact with one another. On the morning of March 1, 2002, King reported to Brosnan that he had told Blottenberger that morning that Blottenberger could no longer reside in his basement and that, subsequently, Blottenberger had left King's home without taking any of his belongings. Two hours later, King retrieved two BB guns from his basement and delivered them to Brosnan, who determined that they were probably the weapons used in the robbery.

King told Brosnan that Blottenberger had informed King that he intended to flee to North Carolina where he could hide out but that he needed King to give him clothes and money to make his escape. Brosnan instructed King to offer to help Blottenberger but to stall him while the FBI developed a plan to arrest Blottenberger. When King told Blottenberger that he would assist him, Blottenberger said he would call King between 4:00 and 4:30 p.m. with instructions as to where to meet him. Brosnan planned to have a team of agents arrest Blottenberger at the meeting place at the same time King handed him a duffel bag of clothes. Brosnan intended to make it look like King was also being arrested to conceal the fact that King was an informant.

Shortly after noon, and with just four hours until Blottenberger's anticipated call, Brosnan began to assemble his arrest team. He first enlisted Defendant Braga, a Special Agent of seven years assigned to the Violent Crimes Squad of the Calverton Resident Agency of the FBI's Baltimore Division. Braga, in turn, solicited Bradlee Sheafe and Stephen Stowe, who then invit-

---

**2.** The following recitation of the facts is based primarily on the facts alleged in plaintiffs' complaints.

ed Donald Kornek to participate. All four of these agents worked in the Calverton Resident Agency.

Brosnan received authorization to arrest Blottenberger from his supervisor, the acting head of the Annapolis Resident Agency, Special Agent Eric Karandy. Karandy called the acting head of the Calverton Resident Agency, Special Agent George Layton, to formally request that Layton approve the participation of Braga and the other agents in the execution of the arrest plan. Layton agreed to make the agents available for assistance but insisted that Brosnan prepare a written Operations Plan and submit it for approval, as required by FBI policy. Brosnan assured him that he intended to make only a static arrest while Blottenberger was at the meeting place and in the process of receiving his clothing and money from King.

Karandy agreed to prepare the Operations Plan while Brosnan left to assist King. He also asked Defendant Hanburger, an agent in the Annapolis Resident Agency, to brief the members of the arrest team. Hanburger has been a Special Agent of the FBI since 1980 and a member of the SWAT Team since 1987. When the four agents arrived from Calverton, Hanburger proceeded to conduct the briefing although the Operations Plan still had not been completed. Hanburger distributed copies of a 1998 arrest photograph of Blottenberger, whom he described as a thirty-three year old white male who weighed 185 pounds and was 5'11". He also told the arrest team that the suspect should be considered armed and dangerous because he was a drug addict and was determined not to be sent back to jail. Hanburger informed the agents of the meeting between King and Blottenberger planned for later that day. He said the agents would communicate via a designated FBI radio channel and, as backup, by Nextel wireless telephones issued to them by the government. Hanburger later admitted in a sworn statement that he did not refer to any Operations Plan during the briefing, nor did he give any specific assignment to members of the team or address the issue of who would identify Blottenberger and what the identifying signal would be. He stated that he expected Brosnan to make the positive identification and alert the rest of the team to that effect.

After the briefing, the arrest team went to a staging area in Glen Burnie to await word from Brosnan regarding where and when the meeting between King and Blottenberger would take place. Meanwhile, Karandy completed the Operations Plan in accordance with Brosnan's intention to make only a static arrest of Blottenberger while he was on foot meeting with King. The Plan did not account for any other contingencies or describe the specific duties of the team members. Nevertheless, Special Agent Layton approved the Plan.

Shortly after 4:00 p.m., King informed Brosnan that he had arranged to meet Blottenberger to deliver the clothes and money at the 7-11 convenience store located at Route 648 and Marley Neck Boulevard. King told Brosnan that Blottenberger might be in a car driven by his girlfriend, who was 5'11" and had red hair. He also said Blottenberger might be wearing a white baseball cap. Brosnan and Special Agent Barry Mones, who was traveling with him, relayed this information to Hanburger, who informed the rest of the team as well. The four SWAT Team members set up surveillance in the area around the 7-11. Hanburger did not go to the 7-11 to coordinate the surveillance but, in a separate car, joined Brosnan and Mones to follow King.

As King was turning into the 7–11 parking lot, he noticed Blottenberger in a red Honda Civic being driven by Blottenberger's sister. Blottenberger and his sister drove past the 7–11 twice and, presumably suspecting that law enforcement officers were staking out the vicinity, left the area thereafter. King tried to call Brosnan while he was still in his truck to alert Brosnan that Blottenberger had left, but he found that his cell phone battery was dead. King ran into the 7–11 and tried to call Brosnan via a 911 operator. While King was still on the line, the 911 operator contacted Anne Arundel County Detectives E. Hodges and S. Gall, who were assisting the FBI agents in the arrest of Blottenberger. The operator told the detectives that Blottenberger was with his sister in a red Honda Civic. The detectives said that they were familiar with the car, as they had seen it "go by once or twice." The Detectives called Hanburger on the County radio that they had given him earlier and told him the news about Blottenberger.

While King was inside the 7–11 calling 911, Kristen Harkum, a sixteen-year old high school student, and her twenty-year old boyfriend Joseph Schultz drove up to the 7–11 in a red Pontiac Grand Am. Harkum, who is 5'7" and has brown hair, parked the car next to King's green truck, obstructing the view of Sheafe and Braga. Schultz, a white male wearing a white baseball cap, got out of the Pontiac and entered the 7–11, where he purchased drinks and snacks. He exited the store a short time later and drove away with Harkum.

The four agents took note of the fact that the car was a Pontiac Grand Am and notified Hanburger and Brosnan of the make and model of the vehicle.[3] They also informed Brosnan that none of them could identify the passenger as Blottenberger because they were too far away from the car. Brosnan, through Mones, telephoned Braga and told him that while they did not know who was in the car, Braga should "just follow," but not stop, the Pontiac. Mones communicated the same instructions to Hanburger and the rest of the team.

The convoy of unmarked law enforcement vehicles followed behind Harkum's car, with Kornek and Stowe in the first car, Sheafe and Braga in the second, Detectives Hodge and Gall in the third, and Hanburger, who had delayed leaving the 7–11, in the fourth car. As the Pontiac approached a red light, Stowe contacted Hanburger by FBI radio and asked him if he wanted the agents to stop the Pontiac. After a brief pause, Hanburger commanded the agents to "take them down."

After stopping for the light, Kornek and Stowe signaled to Harkum to stop and, when she did, angled their vehicle in front of hers. The car that Sheafe and Braga were in stopped behind the Pontiac. All four agents rushed out of their vehicles with automatic assault rifles and surrounded the car, with Stowe and Braga on the passenger side next to Schultz and Kornek next to Harkum. No leader had been designated for the execution of the stop. Braga, Stowe, and Kornek all shouted to the plaintiffs to show their hands and keep them where the agents could see them. The plaintiffs did as they were told. When Stowe and Kornek tried to open the doors and found them locked, the agents ordered the plaintiffs to "unlock the door" and "open the door."

As Schultz moved both of his hands to the right to unlock the door, Braga fired a shot at Schultz. The bullet ricocheted off

---

3. Hanburger denies this allegation.

a part of the vehicle and hit Schultz's face, shattering his cheek and causing substantial injury to the inside of his face and mouth. Harkum's face and body were splattered with Schultz's blood and covered with broken glass. Braga reached into the Pontiac and pulled Schultz out and to the ground where he handcuffed Schultz. Kornek pulled Harkum out and to the ground as well. Sheafe and Stowe later stated under oath that no more than five seconds passed from the time the agents jumped out of their vehicles to the time Braga fired his rifle. In fact, Sheafe was still in the process of exiting his vehicle and taking position behind Kornek when he heard Braga's rifle discharge.

Brosnan arrived on the scene shortly after Schultz was shot. King, who saw the FBI vehicles leave the vicinity of the 7–11, followed them to see where they were going. According to the plaintiffs, when King arrived on the scene of the shooting, he was asked by Brosnan if the man on the ground was Blottenberger. King allegedly replied, "It's not even the f___ car I told you about." King exclaimed that he had reported to the arrest team that Blottenberger was in a Honda Civic but that the agents had pursued a Pontiac Grand Am instead.

Schultz suffered multiple fractures to his mouth, nasal and maxillary sinuses, among other injuries in his mouth and head, which required him to undergo reconstructive surgery. Harkum claims severe emotional and psychological injuries, including clinical depression, anxiety, and sleeping and eating disorders.

## II.

### A.

All three defendants have moved to dismiss the complaint for failure to state a claim. The general rule is that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The Federal Rules require that a complaint simply include a short and plain statement of the claim that will give the defendant fair notice of the nature of the claim and the grounds upon which it is based. *Comet Enterprise Ltd. v. Air–A–Plane Corp.,* 128 F.3d 855, 860 (4th Cir.1997).

In considering a motion to dismiss, the court must accept as true all well-pleaded allegations of the complaint and construe all the facts and reasonable inferences drawn therefrom in the light most favorable to the plaintiff. *Little v. F.B.I.,* 1 F.3d 255, 256 (4th Cir.1993). While a plaintiff must sufficiently plead specific facts to support a claim for relief, the court may ignore any legal conclusions or unwarranted deductions of fact. *Mylan Laboratories, Inc. v. Akzo, N.V.,* 770 F.Supp. 1053, 1059 (D.Md.1991). "A complaint may be dismissed if the law does not support the conclusions argued, or where the facts alleged are not sufficient to support the claim presented." *Id.*

### B.

■ Federal law enforcement officers are generally entitled to qualified immunity from suit for acts committed in their performance of discretionary functions unless their conduct violates clearly established constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Therefore, in order to survive a motion to dismiss on a *Bivens* claim, plaintiffs must specifically allege facts which, if true, would prove a violation of "clearly established constitutional rights of which a reasonable person

would have known." *Id.* 457 U.S. at 818, 102 S.Ct. 2727.

█ Underlying the Supreme Court's development of the doctrine of qualified immunity were its concerns not only with subjecting officials to liability for money damages but also with "the general costs of subjecting officials to the risks of trial— distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737. Consequently, the Court established "[t]he entitlement [as] an *immunity from suit* rather than a mere defense to liability," *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *Pritchett v. Alford,* 973 F.2d 307, 313 (4th Cir.1992). As a result, immunity issues should be resolved at the earliest possible stage in litigation. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991). Thus, "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815.

█ The Fourth Circuit articulated the relevant test for qualified immunity in *Pritchett.* In ruling on a defense of qualified immunity, a court must (1) identify "the specific right allegedly violated"; (2) determine "whether at the time of the alleged violation the right was clearly established"; and (3) if so, then decide "whether a reasonable person in the officer's position would have known that doing what he did would violate that right." *Pritchett,* 973 F.2d at 312. The first two criteria are pure questions of law to be resolved by the court. *Id.* The third criterion, which requires an evaluation of the objective reasonableness of the conduct in question, may necessitate the resolution of disputed factual issues surrounding the conduct. *Id.*

█ In proving that a defendant official has violated a clearly established constitutional right, mere generalizations about the right allegedly violated are not enough. "The right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Furthermore, it is not necessary that the very act in question has previously been held unreasonable; rather, the relevant test is whether, in light of preexisting law, the unlawfulness of the conduct is apparent. *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3039; *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738 ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments"); *Cromer v. Brown,* 88 F.3d 1315, 1324 (4th Cir.1996) (Qualified immunity protects government officials from "being blindsided by liability derived from newly invented rights or new, unforeseen applications of pre-existing rights") (citation omitted).

█ The dispositive inquiry in deciding whether a right is clearly established is whether it would be apparent to a reasonable officer that his actions were unlawful in the circumstances he confronted. *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). The decisive issue, then, is reasonableness. Qualified immunity covers reasonable errors so that officials are not compelled to always err on the side of caution for fear of being sued. *See Davis v. Scherer,* 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82

L.Ed.2d 139 (1984). It is because of this desire to avoid inhibiting officials in their exercise of discretionary authority that qualified immunity has been extended to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 1093, 89 L.Ed.2d 271 (1986). The concerns behind qualified immunity are especially significant in the context of law enforcement, which often requires quick and decisive action in the face of unpredictable and volatile circumstances. *Rowland v. Perry,* 41 F.3d 167, 172 (4th Cir.1994). Thus, qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'" *Trulock v. Freeh,* 275 F.3d 391, 399 (4th Cir.2001) (citation omitted).

While the test is an objective one, "the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." *Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir.1994). The determination of reasonableness must be made in light of the information which the officer actually possessed at the time of the alleged violation, or that was then reasonably available to him, and considering "any exigencies of time and circumstance that reasonably may have affected the officer's perceptions." *Pritchett,* 973 F.2d at 312 (citation omitted). Viewing the situation through the agent's perspective limits the tendency to second-guess the reasonableness of the conduct with 20/20 hindsight and frees de-cision-makers from the need to deal with conflicting versions of the "actual" facts, allowing them to concentrate instead on what the agent reasonably perceived. *Rowland,* 41 F.3d at 173.

### III.

#### A.

Plaintiffs' first claim against Braga arises from Braga's stopping and seizing the vehicle in which they were traveling.[4] Their allegations as to this claim are insufficient to overcome Braga's entitlement to qualified immunity.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures."[5] Subject to limited exceptions, a seizure must be based on probable cause in order to be reasonable. *Dunaway v. New York,* 442 U.S. 200, 214, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979); *Wilson v. Kittoe,* 337 F.3d 392, 2003 WL 21693665, *4 (4th Cir.2003). Probable cause "means 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Pritchett,* 973 F.2d at 314 (quoting *Michigan v. De Fillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979)). However, an officer who mistakenly concludes that probable cause exists is entitled to immunity if his

---

4. Plaintiffs assert generic *Bivens* claims against Braga, Hanburger, and Brosnan in Counts I, II, and III, respectively. The claims against Braga and Hanburger are not broken down into separate component parts in the complaints themselves but they are in plaintiffs' opposition memoranda. Therefore, I address them separately in this opinion.

5. Braga and the other two defendants do not dispute that the arrest team effected a seizure of the plaintiffs when they stopped the vehicle, approached the car with their weapons drawn, and commanded the plaintiffs to put their hands up. Even if the agents had not held plaintiffs at gunpoint, a seizure would have occurred. *See U.S. v. Gray,* 883 F.2d 320, 322 (4th Cir.1989).

conclusion is objectively reasonable in light of the circumstances and information available to the him at the time of the incident. *Hunter*, 502 U.S. at 227, 112 S.Ct. at 536.

 Plaintiffs concede that the agents had probable cause to arrest Blottenberger, but they argue that such probable cause did not extend to the seizure of the plaintiffs. In making that argument, plaintiffs confuse the material issue. In a case of mistaken identity, the relevant question is not whether there was probable cause to arrest the mistaken arrestee. Rather, one must ask whether probable cause existed to arrest the suspect for whom the officers have mistaken the arrestee. " 'When the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest.' " *See also Taft v. Vines*, 70 F.3d 304, 310 (4th Cir.1995); *Thompson v. Prince William County*, 753 F.2d 363 (4th Cir.1985); *Hill v. California*, 401 U.S. 797, 802, 91 S.Ct. 1106, 1110, 28 L.Ed.2d 484 (1971). Thus, the relevant factor in determining whether a mistaken arrest is valid is not whether probable cause existed as to the actual arrestee but whether the officers' mistake of identity was a reasonable one.

Plaintiffs emphasize that the agents were unable to identify Schultz as Blottenberger at the 7–11. They also point out that no exchange of the duffel bag or other interaction between Schultz and King took place, as was expected to occur as the triggering event for arrest. They additionally contend that the agents' failure to attempt to arrest Schultz at the 7–11 was a clear admission by them that no probable cause existed. According to plaintiffs, probable cause was still further negated by the fact that Harkum drove in a reasonable, non-suspicious manner.

 These facts are not sufficient to establish that Braga acted unreasonably in stopping the car and seizing its occupants. Although Braga could not identify the passenger of the Pontiac as he was exiting the 7–11, he did note that he was a white male wearing a white baseball cap and was riding in a car with a female driver, as Blottenberger was expected to do. As to the factor of timing, Schultz was inside the 7–11 at precisely the same time as King. Thus, Braga could have reasonably suspected that Schultz was Blottenberger, as Brosnan presumably did when he directed the arrest team to follow the red Pontiac. Braga was not privy to the information King transmitted to the county detectives and allegedly to Hanburger that Blottenberger had actually left the vicinity and was traveling in a Honda Civic. To the contrary, Braga received an order to stop the vehicle from his superior, who was supervising the operation and was presumably in a position to know whether probable cause existed.[6]

---

**6.** Plaintiffs further fault Braga for having participated in a "dynamic vehicle stop," i.e. one where arresting agents stop a vehicle, rush it with guns drawn, and forcibly remove the vehicle's occupants. The law is well settled that "[i]nvestigating officers may take such steps as are reasonably necessary to maintain the status quo and to protect their safety during an investigative stop." *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir.1988) (citing *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985)). While approaching a suspect with drawn weapons may be an extraordinary measure, the Fourth Circuit has justified it as a reasonable means of counteracting potential danger to police officers confronted with a suspect believed to be dangerous. *Id.* at 214. Here, Braga and his fellow agents were entirely justified in drawing their weapon and instructing the plaintiffs to show their hands in light of the information they had been given by Hanburger that Blottenberger was to be considered armed and dangerous and was wanted for bank robbery.

## B.

Plaintiffs also claim that Braga used excessive force against them. The Supreme Court has held that claims against law enforcement officers for the alleged use of excessive force during an arrest, investigatory stop, or other seizure should be analyzed under the Fourth Amendment's objective reasonableness standard and judged from the perspective of a reasonable officer on the scene of the incident. *Graham v. Connor*, 490 U.S. 386, 395, 397, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). In an excessive force claim, the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443. Ultimately, the court must determine whether the use of deadly force is justified based on the totality of the circumstances. *Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *see also Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir.1994) (stating that courts must avoid making "[a]rtificial divisions in the sequence of events," and should instead view the evidence "in full context, with an eye toward the proportionality of the force in light of all the circumstances").

Deadly force is justified when an officer "has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir.1996). As with most other Fourth Amendment issues, the application of qualified immunity to excessive force claims requires an evaluation of objective reason- ableness based upon the information the officer had at the time force was used. *Saucier*, 533 U.S. at 207, 121 S.Ct. at 2159. Thus, the relevant inquiry in this case is whether Braga had sound reason to believe that Schultz posed a threat of serious physical harm to the agents, and if his belief was mistaken, whether the mistake was reasonable in light of the situation as Braga knew it to be. *See Elliott*, 99 F.3d at 642 (In determining whether excessive force has been used, court should ask "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force").

Here, Blottenberger was wanted for bank robbery, a serious crime. Schultz, however, was not actively resisting arrest or attempting to evade arrest by flight once the agents stopped the vehicle. Furthermore, it is unclear whether he posed an immediate threat to the safety of the agents. In the briefing they received from Hanburger, the agents were told that Blottenberger was suspected of being armed and dangerous. However, the parties dispute whether Schultz's actions during the seizure could have been perceived as threatening the use of a weapon. Plaintiffs allege that Schultz's hands remained in view of the agents the entire time, while Braga asserts that Schultz moved his hands down towards his waist and out of sight. If plaintiffs' allegations are correct, Braga would have no reason to believe that Schultz could potentially harm the agents. If, on the other hand, Braga saw Schultz move his hands down, perhaps Braga may have reasonably suspected that Schultz was reaching for a weapon, in which case the use of force might have been reasonable even if Braga's suspicion turned out to be mistaken. Thus, at least one critical factual question is presented.[7]

---

**7.** Although the Fourth Circuit has granted qualified immunity in cases where the defen-

The Supreme Court has made clear that a court determining whether a plaintiff has stated a violation of the right against excessive force must construe the facts in the light most favorable to the plaintiff. *Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156. Accordingly, I must accept as true the plaintiffs' allegation that Schultz's hands remained in view of the agents throughout the stop.[8] This allegation, considered together with the other facts reflecting that (1) Schultz and Harkum did nothing to resist arrest or flee the scene, (2) they complied with the agents' orders, and (3) Braga fired his shot within five seconds of arriving at the scene, requires that Braga's motion to dismiss be denied and that the case go forward.

## IV.

Plaintiffs next claim that Hanburger is liable for instructing the team to stop and seize the plaintiffs without probable cause. Plaintiffs assert that Hanburger is not entitled to qualified immunity because no reasonable agent having the information Hanburger possessed could have believed that Schultz was Blottenberger.

Plaintiffs allege that Hanburger knew the red Pontiac was not the car in which Blottenberger was riding. According to plaintiffs, Detectives Hodges and Gall—who had received the message from the 911 operator with whom King had spoken after discovering that Blottenberger had left the vicinity of the 7–11—informed Hanburger that the car Blottenberger was in was believed to be a red Honda Civic, as per King's description to the 911 operator. Although the detectives did not expressly notify Hanburger that King had seen Blottenberger leave the area of the 7–11, their description of the vehicle that contained Blottenberger allegedly was enough to put Hanburger on notice that Harkum's red Pontiac was not the car carrying the suspect.

Hanburger concedes that the Court must assume, as the complaint alleges, that information about the red Honda Civic was transmitted, i.e., sent out. However, he contends that it must be reasonably

---

dant officer shot the plaintiff in the reasonable belief that the plaintiff was reaching for a weapon, those cases are distinguishable. *See Slattery v. Rizzo,* 939 F.2d 213 (4th Cir.1991) (suspect would not obey order to put his hands up and appeared to have his hand closed around an object); *Greenidge v. Ruffin,* 927 F.2d 789 (4th Cir.1991) (suspect reached for a long cylindrical object in back seat); *Anderson v. Russell,* 247 F.3d 125 (4th Cir. 2001) (after initially obeying order to raise his hand, suspect reached into his back pocket where officer observed a bulge). In none of these earlier cases did the officer confront a suspect who kept his hands empty and in view of the officer, as alleged in the instant case. Moreover, I am not prepared to say without development of a complete factual record through discovery that a law enforcement officer has qualified immunity to shoot an innocent person who is attempting to release a seat belt in order to comply with the officer's direction to unlock a car door even if his hands may have momentarily gone out of the officer's view.

8. Braga argues that I should consider news articles in which Harkum and her lawyer stated that Schultz reached down to unfasten his seatbelt, in direct contradiction to plaintiffs' current allegations that Schultz's hands remained in view. Under Fed.R.Civ.P. 12(b)(6), courts may not consider documents other than the complaint in deciding a motion to dismiss, unless the motion is converted to a motion for summary judgment. Courts have made "exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson v. Page,* 987 F.2d 1, 3–4 (1st Cir. 1993). The news articles Braga refers to do not fit into any of these exceptions. Therefore, I may not properly consider them in evaluating plaintiffs' claims.

inferred that he did not actually receive the transmission because it would have been absurd for him to allow the team to follow and stop the wrong car if he had received the information about the red Honda Civic. Although this contention may ultimately be persuasive to the fact-finder, it does not provide a basis for granting a motion to dismiss, particularly since Hanburger was closely monitoring events as they unfolded. The facts alleged by plaintiffs must be assumed to be true. Thus, Hanburger is not entitled to qualified immunity as to his own role in the stop of plaintiffs' vehicle.

## V.

 Plaintiffs' final claims are against Hanburger and Brosnan for the allegedly unconstitutional manner in which they organized and supervised the search and seizure operation. To the extent that plaintiffs are asserting that Hanburger and Brosnan are directly liable for their actions and inactions, plaintiffs must allege facts sufficient to overcome defendants' qualified immunity under the same standards I have described earlier in this opinion. To the extent that plaintiffs are relying upon a theory of supervisory liability, they must, in addition to overcoming defendants' qualified immunity defense, allege facts in the first instance that meet the following elements of proof:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices;' and (3) that there was an 'affirmative causal link' between the supervisor's inaction and

the particular constitutional injury suffered by the plaintiff.

To satisfy the requirements of the first element, a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury. *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994).

### A.

 Plaintiffs' supervisory claim against Hanburger focuses on his briefing the arrest team without a written Operations Plan and failing to follow FBI procedures in planning the arrest. Mere violation of FBI procedural requirements does not amount to a constitutional violation. Rather, the pertinent question is whether a reasonable agent in Hanburger's position would have known that such procedural errors would violate constitutional rights in the particular circumstances that confronted him. *Taft v. Vines,* 83 F.3d 681, 684 (4th Cir.1996).

This question must be answered in the negative. Hanburger was required to instruct the arrest team within a short time-frame. Given that fact, it was reasonable for him to proceed with the briefing despite the lack of a written Operations Plan, which he knew was being developed simultaneously. Likewise, the briefing was not so deficient as to constitute a constitutional breach. Hamburger distributed copies of a photograph of Blottenberger, provided an oral physical description, and told the

arrest team that Blottenberger was to be considered armed and dangerous. He informed the agents of the planned meeting between King and Blottenberger and instructed the team members that they were to communicate with one another via FBI radio and their Nextel wireless phones. Against this background, the fact that Hanburger did not provide the agents with Blottenberger's criminal history, give out specific assignments to individual agents, or designate a protocol for signaling the identification of Blottenberger is not fatal to the constitutionality of the briefing he gave.

### B.

Plaintiffs' claims against Brosnan are based upon their allegations that he exhibited reckless indifference to their constitutional rights by (1) enlisting Braga to participate on the arrest team in light of his prior shooting of a fugitive, (2) failing to place appropriate and necessary controls upon the members of the arrest team, and (3) failing to assure appropriate means of communication among members of the arrest team and with the informant, Timothy King.

### (1)

■ Brosnan's inclusion of Braga on the arrest team, even given his knowledge of Braga's previous shooting, does not rise to the level of a constitutional violation. While plaintiffs claim that Brosnan knew of Braga's previous shooting of an unarmed fugitive, there is no indication that Brosnan had first-hand knowledge of the incident. Brosnan worked in a different resident agency of the FBI and had never before supervised Braga. In fact, plaintiffs themselves point merely to that one shooting as evidence of Braga's "propensity" to shoot unarmed individuals. Evidence of a solitary incident is insufficient to show a propensity and cannot be

deemed to have put Brosnan on notice of any dangerous tendencies Braga might have had. This is especially true in the instant case, where Brosnan knew the FBI Shooting Review Board had ultimately determined that Braga's prior shooting was reasonable and justified. Furthermore, the reasonableness of Brosnan's recruitment of Braga is supported by the fact that the acting heads of both the Calverton and Annapolis Resident Agencies approved of Braga's participation on the team.

■ Moreover, to the extent that plaintiffs' claim against Brosnan for including Braga on the arrest team rests on a theory of supervisory liability under *Shaw,* they have not made the necessary showing of widespread abuses by Braga which is essential to establishing that a pervasive and unreasonable risk of harm existed. Nor have they shown that Brosnan was aware that Braga engaged in conduct that posed such a pervasive and unreasonable risk of constitutional injury. At most, plaintiffs allege that Brosnan was aware of one previous incident in which Braga shot a fugitive. Knowledge of this incident alone is insufficient to meet the standard for supervisory liability set forth by the Fourth Circuit. *See Slakan,* 737 F.2d at 373.

### (2)

■ The same weaknesses attend plaintiffs' attempt to impose liability upon Brosnan for his alleged failure to exercise appropriate and necessary controls upon the agents and his failure to assure adequate modes of communication among team members. Plaintiffs contend that Brosnan violated their Fourth Amendment rights by proceeding with a deficient Operations Plan and by allowing the arrest team to go forward, using unreliable FBI radio channels to communicate with one another. Specifically, plaintiffs allege that the Plan was deficient in its failure to

provide for the contingency of a vehicle stop, and anticipated only a static arrest of Blottenberger on foot. Plaintiffs also complain that the Plan failed to designate a team leader, include specific assignments for team members, and specify an identification signal to be used by a designated member to positively identify the suspect.

While making these allegations, plaintiffs do not even attempt to show how Brosnan's failure to follow FBI procedures and assure adequate communication channels meet the elements of supervisory liability established in *Shaw*. They do not allege that such logistical mistakes were part of a pattern of abuses of constitutional rights, nor that Brosnan or any of his subordinates engaged in organized conduct that posed a pervasive and unreasonable risk of harm. Without further specific allegations that Brosnan continually refrained from taking corrective action in the face of procedural errors, plaintiffs cannot lodge a claim under the theory of supervisory liability for the procedural defects which may have occurred.

■■■ Plaintiffs' allegations regarding Brosnan's procedural and logistical errors also fail under a direct liability theory. The Fourth Circuit has made it clear that the issue "is not whether the officers violated police procedures, or even whether they, in fact, violated the Fourth Amendment. Rather, the question is whether, confronted with the facts of this case, reasonable police officers should have known that clearly established constitutional law prohibited the methods used..." *Taft*, 83 F.3d at 684.

There has been no showing that Brosnan violated clearly established constitutional rights, nor that established constitutional law prohibited the methods he used in implementing the Operations Plan at issue. First, Brosnan did not even write the Operations Plan himself. His supervisor, Agent Karandy, prepared the Plan, and another FBI supervisor, Agent Layton, approved it. Second, the fact that the Operations Plan did not anticipate every possible contingency, including the need for a vehicle stop, did not make it so deficient as to give rise to constitutional injury. It would be impossible for the FBI to anticipate and plan for every contingency deriving from the execution of a staged arrest plan, especially one developed on short notice. In fact, it is the very nature of law enforcement that circumstances are often unpredictable and agents must be given the latitude to react to unexpected events. *See Graham*, 490 U.S. at 397, 109 S.Ct. at 1872 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving"). That is, of course, the whole basis for the qualified immunity defense in the first instance.

■■■ Plaintiffs' final allegation—that the FBI radio system has been flawed since 1999 and that use of it violated their rights—also fails. At most, the allegation would give rise to a claim of negligence, not to a *Bivens* claim. As an individual agent, Brosnan was not violating anyone's clearly established constitutional rights by having a surveillance team employ a radio system regularly used by his agency.

## VI.

■■■ In addition to seeking dismissal of the claims against him, Braga has moved to strike the entire portion of the complaint referring to the incident of February 3, 2000, in which he shot an unarmed fugitive but was later exonerated by the FBI Shooting Review Board. Fed. R.Civ.P. 12(f) gives the court the discretion to strike "any redundant, immaterial, im-

pertinent or scandalous matter" in the pleadings. Rule 12(f) motions are disfavored, however, and "should be denied unless the allegations 'have no possible relation to the controversy and may cause prejudice to one of the parties.'" *Graff v. Prime Retail, Inc.,* 172 F.Supp.2d 721, 731 (D.Md.2001); 5A Wright & Miller, *Federal Practice and Procedure* §§ 1382 (2d ed.1990).

Here, plaintiffs contend that their allegations concerning the February 3, 2000 shooting incident relate to their claim against Brosnan for supervisory liability. For the reasons I have stated, that claim fails as a matter of law and no longer is part of the case.

Plaintiffs also contend that the prior incident relates to their claim against Braga himself because it pertains to his state of mind when he shot Schultz. That is an issue that should be resolved at a later stage of this litigation as an evidentiary matter under Fed.R.Evid. Rule 404(b) rather than as a matter of pleading. In light of the fact that in making allegations about the February 20, 2000 incident plaintiffs have chosen to use inflammatory language that is not in keeping with the spirit of notice pleading contemplated by the Federal Rules of Civil Procedure and that is prejudicial to Braga's reputation, his motion to strike will be granted.

A separate order is being entered herewith.

### ORDER

For the reasons stated in the accompanying opinion, it is, this 13th day of November 2003

ORDERED

1. Defendant Christopher Braga's motion to dismiss is granted in part and denied in part;

2. Defendant Henry F. Hanburger's motion to dismiss is granted in part and denied in part;

3. Defendant Lawrence S. Brosnan's motion to dismiss is granted and all claims against him are dismissed; and

4. Defendant Braga's motion to strike is granted.