Soua Say YANG, individually and as Trustee for the Heirs and Next of Kin of Thai Yang, Deceased, Kang Yang, Sing Pao Lor, Chee Lor, and Ong Lor, as Trustee for the Heirs and Next of Kin of Basee Lor, Deceased, Plaintiffs,

v.

Kenneth E. MURPHY, individually and as a police officer of the City of Inver Grove Heights, Minnesota, and the City of Inver Grove Heights, a Minnesota municipal corporation, Defendants.

Civ. No. 3–90–417.

United States District Court,
D. Minnesota,
Third Division.

June 15, 1992.

David McKenna, Richard Kyle, St. Paul, Minn., for plaintiffs.

Pierre Regnier, Leonard Schweich, St. Paul, Minn., for defendants.

## ORDER

RENNER, District Judge.

The captioned matter came before the Court on June 11, 1992, upon the defendants' Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. The defendants were represented by Pierre N. Regnier and Leonard Schweich. David McKenna and Richard Kyle represented the plaintiffs.

The Court having considered said Motion, arguments of counsel, and all of the files, records, and proceedings herein, it is hereby ORDERED that:

1. the Motion of defendant City of Inver Grove Heights is GRANTED, and all federal law and State law claims against it are dismissed with prejudice;

2. the Motion of defendant Kenneth E. Murphy is GRANTED with respect to all state law claims, and those claims are dismissed with prejudice;

3. the Motion of defendants with respect to claims under the Eighth, Fifth, and Fourteenth Amendments is GRANTED, and these claims are dismissed with prejudice;

4. the Motion of defendant Kenneth E. Murphy with respect to § 1983 claims alleging violations of the Fourth Amendment is DENIED.

## MEMORANDUM

### BACKGROUND

This case arises from the deaths of Thai Yang and Basee Lor, who were shot by defendant Kenneth E. Murphy, a police officer of the defendant City of Inver Grove Heights, Minnesota. The plaintiffs are family members and trustees for the heirs of the decedents. They have brought claims for relief under federal civil rights statutes, the Minnesota Human Rights Act, and state tort law. Defendants moved for summary judgment.

The defense relies heavily upon Murphy's deposition testimony. Plaintiffs question Murphy's credibility, asserting that there are discrepancies between his story and the testimony of two other officers who were present at the scene of the shooting. Plaintiffs also question the reasonableness of Murphy's action, even if one assumes his veracity. Since Murphy's version of the events is central to this suit, the Court will begin by summarizing Murphy's deposition testimony.

Officer Murphy began working for the Inver Grove Heights Police Department in 1969. He received basic training in that year and has received ongoing education through courses at the Inver Hills Community College, the Dakota County Technical Institute, and the Police Department. This has included repeated training on use of deadly force and firearms. Murphy did not receive any racial sensitivity training, nor was any required by the Police Department, until 1990.

Murphy was alone in his squad car on November 15, 1989, when, at approximately 12:30 p.m. the police dispatcher stated that officers were chasing a stolen vehicle at high speed. The three suspects were described as Asians. When Murphy heard that they had abandoned the car and were fleeing on foot, he decided to try to meet them at a raspberry farm which he thought they were likely to reach.

Murphy advised the dispatcher of his position and got out of the squad car with his 12 ga. shotgun, which was loaded with 00 buckshot. Murphy saw no sign of the suspects in the fresh snow, and he hid himself behind an old hay wagon in the back yard of the house, overlooking a raspberry patch. After a few moments, Murphy saw two of the suspects coming out of the woods and going towards the raspberry patch. He says he could see that they were Asian, but he could not ascertain that they were not fully grown. He notified the dispatcher, then he turned off his radio so the boys would not be able to hear it.

At his deposition, Murphy testified that he saw Yang and Lor stop suddenly and

look up in the direction of the barn, which was near the house. He says he then stood up and hollered, "Police. Don't move." Murphy states that Lor then bolted toward the raspberry patch and disappeared, while Yang stopped, looked at Murphy, and raised his hand while turning toward him. Murphy testified he saw a flash from a shiny object in Yang's hand, which looked like the barrel of a .22 pistol. He crouched down.

After a few seconds, Murphy says he looked up again, ready to shoot, and saw Yang kneeling or bent on the ground, with his back towards Murphy. Then, according to Murphy, Yang suddenly snapped his head around, looked towards Murphy, and raised his right hand again. Murphy fired his shotgun, and Yang disappeared behind tall grass.

After a short hesitation, Murphy began walking toward the raspberry patch. He then heard a voice hollering, "Stay where you are. Don't move." He looked to his left and saw Rosemount Patrolman Bryan Weatherford, who was wearing plain clothes and walking towards the raspberry bushes with his pistol drawn. Murphy warned Weatherford to the effect that Yang had something in his hand.

They found Yang lying prone, pulling himself along the ground with his hands. Murphy soon saw Lor lying in the bushes, perhaps ten to fifteen feet from Yang. Lor said that he was hurt and unable to get up. Murphy told Lor to keep his hands in sight and then pat him down.

Neither Yang nor Lor were holding anything. Yang had a screwdriver in a coat jacket. Murphy found another screwdriver, with a stainless steel blade, lying on the ground between Lor and Yang.

This concludes the Court's summary of Murphy's testimony. The plaintiffs point to a number of additional facts. They note that the radio log shows that 48 seconds passed between the time that Murphy radioed that he saw the boys and the firing of the shotgun. Plaintiffs raise the issue of whether this would be sufficient time for Murphy to observe if they were armed.

Plaintiffs also submit excerpts from the depositions of Weatherford and the Chief of the Rosemount Police Department, James Staats. These two officers arrived at the raspberry farm just prior to the shooting. Weatherford testified that as he came over the hill towards Murphy, he noticed two boys walking alongside the raspberry field, approximately 100 yards away. He pointed them out to Staats, then he yelled, "police, stop." The boys continued walking, and Weatherford concluded they did not hear him. He yelled a second time, and they stopped and looked around.

Weatherford states he began to run or walk quickly toward the boys. Then they appeared to see him. They turned around and started running to the south and then into the raspberry field. Right after they went into the raspberry field, Weatherford heard Murphy's shot. Weatherford had not previously heard or seen Murphy.

Weatherford testified he then saw Murphy walking with his shotgun towards the raspberry patch. Weatherford ran towards Murphy, identifying himself as an officer. He says he heard Murphy yell twice that, "One of them has something in their hand." He and Murphy then searched the boys and the area.

ANALYSIS

Summary judgment is appropriate where the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, upon which it bears the burden of proof at trial. *Celotex v. Catrette*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *Jane Doe A. v. Special School District*, 901 F.2d 642 (8th Cir.1990).

I. 42 U.S.C. § 1983 CLAIMS AGAINST THE CITY

In order to bring a Section 1983 action against a municipality, a plaintiff must plead, with specific factual allegations, that a governmental official deprived

the plaintiff of a constitutional right while acting in accordance with a municipal policy or custom. *Monell v. City of New York Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rogers v. Lincoln Towing Services, Inc.*, 771 F.2d 194 (7th Cir.1985). In bringing a case alleging unconstitutional practices in the training of police officers, a plaintiff must show that: "the city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989). Plaintiffs must also establish a causal link between the municipal policy and the alleged constitutional deprivation.

■ Plaintiffs have abandoned any claim that the Police Department failed to adequately train its officers on the use of deadly force. Indeed, the record establishes that Murphy's training in this regard was extensive and routinely updated. Nonetheless, plaintiffs assert that the failure to train officers in racial sensitivity shows deliberate indifference to the constitutional rights of its inhabitants.

Defendants cite two cases which have held that a city may decide not to provide racial sensitivity training. *Dempsey v. Town of Brighton*, 749 F.Supp. 1215 (W.D.N.Y.1990), *aff'd*, 940 F.2d 648 (2nd Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 338, 116 L.Ed.2d 278 (1991); *Michener v. Lower Providence Township*, 1989 Westlaw 66418 (E.D.Pa.). Plaintiff attempts to distinguish these cases by noting that the constitutional violations alleged therein led to much less severe consequences than the violations alleged by plaintiffs.

At any rate, plaintiffs have failed to develop any factual record concerning the prevalence and effectiveness of racial sensitivity training. Likewise, there is no evidence of a causal link between the lack of such training and the shooting at issue.

■ Plaintiffs also assert that the City had a *de facto* policy of ratifying the use of deadly force by its police officers. The only evidence of such a policy relates to the City's reactions to the incident that is the subject of this litigation. They note that the City conducted no independent investigation of the incident. Rather, it relied upon the report of the Minnesota Bureau of Criminal Apprehension and the decision of a Grand Jury not to return an indictment.

The Court concludes that this evidence does not raise a genuine issue of fact that the City had a *de facto* policy of condoning deadly force which *caused* Murphy to violate the Constitutional rights of Yang and Lor.

## II. CLAIMS UNDER 42 U.S.C. § 1983 AGAINST MURPHY

### A. The Seizure of Lor

■ Plaintiffs bring claims under 42 U.S.C. § 1983 for violations of the Fourth Amendment prohibition on unreasonable seizures. To prove this claim, plaintiffs must show that there was a seizure and that it was unreasonable. The Supreme Court has held, "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

The parties agree that Murphy seized Yang. Nonetheless, defendants argue that Lor was not seized, because Murphy did not intend to shoot him. Plaintiffs challenge the legal theory and the factual predicate behind this argument.

The Supreme Court has addressed the element of intent in Fourth Amendment seizures in *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). *Brower* arose from a high speed chase of a fleeing suspect which ended when the suspect drove into a road block the police had erected for the purpose of apprehending him. The Supreme Court held that the complaint stated a cause of action under Section 1983. Justice Scalia, writing for the Court, distinguished those facts from a hypothetical case where a parked police car slips its brake and injures a passerby, even if he happens to be a fleeing suspect. The Supreme Court explained:

a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent bystander), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

*Brower,* at 1381.

Defendants cite this passage for the proposition that the deadly shooting of an unintended victim, who happens to be a suspect, is not a seizure. This is a misunderstanding of *Brower.* That case unambiguously states that: "A seizure occurs even when an unintended person or thing is the object of the detention or taking, ..." *Brower,* at 1381. There is only a requirement that the *means* of the seizure be applied with the intention to apprehend a suspect.

In the case at bar, Murphy intended to apprehend a suspect, and he intended to do so by firing his shotgun. Furthermore, he desired to apprehend Lor, although he says he did not intend to do so by means of his shotgun. The result was that Murphy restrained Lor's freedom to walk away. Thus, the shooting of Lor was a seizure, subject to the reasonableness requirement of the Fourth Amendment.

### B. The Reasonableness of Murphy's Conduct

Since both boys were seized, the question then arises as to whether the seizures were reasonable. An analysis of whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Careful attention to the facts of the particular case is necessary, including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.,* 109 S.Ct. at 1872. Reasonableness of use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.*

The inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham, supra,* 109 S.Ct. at 1872. Nonetheless, a factfinder may consider motivation in assessing the credibility of an officer's account, and an officer's objective good faith may be relevant to the defense of qualified immunity. *Id.,* 109 S.Ct. at 1783.

The parties differ on the severity of the crime of auto theft. Indeed, plaintiffs characterize the crime at issue as "joy riding." The Minnesota Sentencing Guidelines provide that Motor Vehicle Use Without Consent, Minn.Stat. § 609.52, subd. 2(17) has an offense category level of three, while Theft of a Motor Vehicle, Minn.Stat. § 609.52 subd. 3(3)(d)(v) has an offense category level of four. Neither of these crimes leads to a presumptive commitment to state imprisonment under the guidelines until a defendant's criminal history score reaches four. These crimes are considered less severe than either burglary of a residence or simple robbery. Auto theft does not usually involve violence, and Murphy had no reason to believe that Yang or Lor had injured or threatened any other person.

Yang and Lor were attempting to evade arrest by flight. They had engaged the police in a dangerous high speed automobile chase. They were on foot by the time Murphy saw them, walking through fresh snow in daylight and pursued by numerous officers. They were not likely to succeed in their attempts to avoid arrest.

Obviously, the critical issue in this case is whether Yang posed an immediate threat to the safety of Murphy. Plaintiffs con-

tend that four central factual questions cannot be resolved without trial, as follows:

1) Did Officer Murphy believe one of the children was armed with a pistol?

2) Was it objectively *reasonable* for Murphy to conclude that one or both of the decedent children was armed with a pistol?

3) Was it objectively *reasonable* for Murphy to infer that one of the children made a threatening gesture with the object he thought was a pistol?

4) Was it objectively *reasonable* for Murphy to fear for his own safety as a result?

Plaintiffs' Memorandum, at 2.

Plaintiffs emphasize that Weatherford's testimony differs from Murphy's in that Weatherford states that the boys ran together into the raspberry bushes upon seeing him, that he did not hear Murphy order the boys to stop, that he did not see any object in their hands, and that he could tell that they were children. Both boys were thirteen years old; Lor was five feet tall and weighed 97 pounds, Yang was four feet six inches in height and weighed 72 pounds.

Plaintiffs also note that Murphy told Weatherford he had seen, "something" in Yang's hand, rather than identifying it as a pistol. They argue that it is unreasonable to confuse the configuration of a hand holding a pistol with that of a hand holding a screwdriver. Plaintiffs note that Murphy never claimed he believed that Yang actually aimed any pistol at him.

They also contend, apparently without submitting any factual support, that a reasonable officer would know that a pistol is unlikely to be dangerous at a distance of more than fifty yards. They assert that a pistol is even less likely to be dangerous in the hands of a child.

Considering all of the facts and circumstances in the light most favorable to the nonmoving party, the Court holds that plaintiffs have raised genuine issues of fact. A reasonable finder of fact could infer from Weatherford's testimony that Murphy shot the boys without warning, or that Murphy's actions, judged from the perspective of a reasonable officer, were not objectively reasonable.

C. Qualified Immunity

 Murphy contends that he is protected by qualified immunity from the claims under 42 U.S.C. § 1983. This doctrine shields public officials from suit, as well as liability, unless an official's conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). As applied to police officers, the test is whether a reasonably well-trained officer would have known the act was illegal, and immunity should be granted if officers of reasonable competence could disagree on this issue. *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Whether an official is immune turns on the objective legal reasonableness of his conduct.

 Murphy notes, correctly, that it is not enough to generally assert that the Fourth Amendment clearly establishes a right to be free from unreasonable seizures, citing *Anderson v. Creighten,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Plaintiffs cite the same case for the proposition that the very act in question need not have been held unlawful, rather, "in the light of preexisting law the unlawfulness must be apparent."

It is clearly established that the Fourth Amendment prohibits an officer from using deadly force to apprehend a suspect "where the suspect poses no immediate threat to the officer and no threat to others." *Tennessee v. Garner, supra* at 11, 105 S.Ct. at 1701. A reasonable officer would know this. Viewing the facts in the light most favorable to plaintiffs, one could reasonably infer that Murphy violated this clearly established right and acted in an objectively unreasonable manner. Thus, Murphy is not entitled to qualified immunity.

D. Due Process Claims

 Plaintiffs have brought claims under the Eighth Amendment prohibition on

**1252**

cruel and unusual punishment. They also allege violations of their rights under the Fifth and Fourteenth amendments not to be deprived of their rights to parenthood and sibling relationships without due process of law.

Defendants move for summary judgment as to these claims, on the basis that the Supreme Court has held that:

> all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

*Graham v. Connor, supra,* 109 S.Ct. at 1871.

Plaintiffs concede that their Eighth Amendment claim is barred. Yet they assert the Eighth Circuit has previously allowed substantive due process claims like their own. *Mattis v. Schnarr,* 502 F.2d 588 (8th Cir.1974), *on remand,* 404 F.Supp. 643 (E.D.Mo.1975), *rev'd on other grounds,* 547 F.2d 1007, (8th Cir.1976), *vacated as moot sub. nom. Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977). They also cite cases from other circuits, which were decided in 1984 and 1985. Nonetheless, *Graham v. Connor,* which came down in 1989, makes the Fourth Amendment an exclusive constitutional remedy for claims arising from the use of excessive force in the seizure of free citizens.

### III. State Law Claims

**A. Common Law Claims against Murphy—Official Immunity**

■■■■■ Defendants argue that official immunity shields Murphy from liability for the state tort claims. Minnesota law holds that "A public official charged by law with duties which call for the exercise of judgment or discretion is not personally liable to an individual for damages unless he is guilty of willful or malicious wrong." *Elwood v. Rice County,* 423 N.W.2d 671, 677 (Minn.1988). Police officers are generally classified as discretionary officers entitled

to immunity. *Johnson v. Morris,* 453 N.W.2d 31 (Minn.1990).

Plaintiffs contend that a jury could infer that Murphy willfully and maliciously committed a wrong. Yet plaintiffs cannot rely on bare allegations of malice, but must present specific facts evidencing bad faith. *Reuter v. City of New Hope,* 449 N.W.2d 745 (Minn.App.1990). They have not done so. Consequently, summary judgment is appropriate on the state law claims against Murphy.

**B. Common Law Claims Against the City—Discretionary Immunity**

■■■■■ As for the City of Inver Grove Heights, defendants argue it is protected by discretionary immunity. This doctrine shields municipalities and their employees from any claim based upon the performance or the failure to exercise a discretionary function or duty. Specifically, the doctrine of discretionary immunity protects those governmental decisions which involve the balancing of policy objectives. *Nusbaum v. County of Blue Earth,* 422 N.W.2d 713 (Minn.1988). The City's actions in training and supervising its police officers involve balancing of policy objectives. Hence, discretionary immunity bars the. all state tort claims against the City.