Joseph C. SCHULTZ, Plaintiff–
Appellee,

and

Kristen M. Harkum, Plaintiff,

v.

Christopher BRAGA, Defendant–
Appellant,

and

Henry F. Hanburger; Lawrence S.
Brosnan; Federal Bureau of
Investigation, Defendants.

Kristen M. Harkum, Plaintiff–
Appellant,

and

Joseph C. Schultz, Plaintiff,

v.

Christopher Braga, Defendant–
Appellee,

and

Henry F. Hanburger; Lawrence S.
Brosnan; Federal Bureau of
Investigation, Defendants.

Nos. 05–1604, 05–1610.

United States Court of Appeals,
Fourth Circuit.

Argued May 22, 2006.

Decided July 31, 2006.

**ARGUED:** Susan Quarngesser Amiot, Silverman, Thompson & White, L.L.C., Baltimore, Maryland, for Christopher Braga. Arnold Murray Weiner, Weiner & Weltchek, Lutherville, Maryland, for Joseph C. Schultz; Steven Aaron Allen, Hodes, Ulman, Pessin & Katz, P.A., Towson, Maryland, for Kristen M. Harkum. **ON BRIEF:** Andrew C. White, Donna M.B. King, Silverman, Thompson & White, L.L.C., Baltimore, Maryland, for Appellant/Cross–Appellee Christopher Braga. Barry L. Gogel, David M. Kowitz, Weiner

& Weltchek, Lutherville, Maryland, for Appellee Joseph C. Schultz.

Before WILKINSON and TRAXLER, Circuit Judges, and RICHARD L. WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge TRAXLER wrote the opinion, in which Judge WILKINSON and Judge WILLIAMS joined.

## OPINION

TRAXLER, Circuit Judge.

Plaintiffs Joseph Schultz and Kristen Harkum brought these actions against Special Agent Christopher Braga of the Federal Bureau of Investigation, alleging that Agent Braga unconstitutionally employed excessive force against them when he shot Schultz, who was seated next to Harkum in the passenger seat of her vehicle, after the vehicle had been stopped by an FBI arrest team. Agent Braga moved for summary judgment on the basis of qualified immunity, which the district court denied as to Schultz's claim, but granted as to Harkum's claim. We affirm.

## I.

Because this is an appeal from the grant of summary judgment to the defendant, we review the facts in the light most favorable to the plaintiffs. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

On February 20, 2002, an Allfirst Bank branch in Pasadena, Maryland, was robbed by a single gunman who fled the scene in a stolen pickup truck driven by a second man. FBI Agent Lawrence Brosnan was assigned to investigate the robbery. Approximately one week after the robbery, an Anne Arundel County detective received an anonymous tip that Michael Blottenberger, a heroin and crack addict who had been recently released from prison, had robbed the bank.

In the course of investigating Blottenberger as a suspect, Agent Brosnan interviewed Timothy King, a friend and coemployee of Blottenberger who had also rented Blottenberger the basement area of his home. King began cooperating with Agent Brosnan in the investigation and, on March 1, 2002, told Agent Brosnan that Blottenberger had confessed to driving the getaway car for the robbery. King also found two silver and black air pistols and a sweat suit in the basement which matched the description of the gun and clothing used by the robber. Based upon his investigation, Agent Brosnan received verbal authority to arrest Blottenberger and began the process of seeking a formal arrest warrant.

In the meantime, Blottenberger contacted King and told him that the FBI was looking for him. Blottenberger asked King to bring him some personal clothing and money so that he could flee the area. King immediately reported this information to Agent Brosnan and told Agent Brosnan that Blottenburger might be suicidal. When Agent Brosnan relayed this information to his superiors, he again received verbal authorization to arrest Blottenberger and began working on an operational plan to arrest Blottenberger when Blottenberger met with King. An FBI arrest team was assembled and briefed by Agent Henry Hanburger, who was Agent Brosnan's partner. The team members included Agent Christopher Braga, Agent Stephen Stowe, Agent Donald Kornek, and Agent Brad Sheafe. During the briefing, the agents were told that Blottenberger was a heroin and crack addict with an extensive criminal record (including convictions for drug charges, assault with a

weapon and attempted murder), and that he should be considered armed and dangerous. The agents were also told that Blottenberger intended to flee the area, was determined not to be returned to prison, was possibly suicidal, and might pose a "suicide-by-cop" risk.

As the day progressed, the plan for Blottenberger's arrest centered on King's arrangement to meet him at a 7-Eleven convenience store with a bag containing the requested personal items. Agents Kornek and Stowe, and Agents Sheafe and Braga, riding in two unmarked vehicles, set up surveillance of the 7-Eleven store. Agents Brosnan and Hanburger, also in separate vehicles, were in the vicinity, but not within eyesight of the 7-Eleven. The surveillance agents were told that King would park his pickup truck in the parking lot and go inside. Blottenberger was expected to be wearing a white baseball cap and to arrive in a red vehicle being driven by a woman with red hair.

During surveillance, the four agents observed a red vehicle, driven by a woman with red hair, pull into the 7-Eleven parking lot and park next to King's truck. A male passenger, wearing a white baseball cap, got out of the car and entered the 7-Eleven. When he returned to the car, the woman drove him away. These observations were relayed to Agent Brosnan, who ordered the surveillance team to follow the car. The lead FBI vehicle was driven by Agent Kornek with Agent Stowe as his passenger. Following close behind was the vehicle driven by Agent Sheafe, with Agent Braga as his passenger. .

All of the agents believed that the passenger in the red car was Blottenberger, and that the driver was Blottenberger's girlfriend, Lisa. In actuality, the occupants were 16-year-old Harkum and her 20-year-old boyfriend Schultz, who had stopped at the 7-Eleven on the way home

from the local mall. King, who was still at the 7-Eleven, saw Blottenberger and Lisa drive by in another red car, but they did not stop. Unfortunately, King's efforts to get this message to Agent Brosnan and the other arrest team members failed.

As Harkum's car approached an intersection with a traffic light, the surveillance agents radioed Agents Brosnan and Hanburger and asked if they should stop the vehicle. Due to a radio failure, Agent Brosnan was unable to respond. Agent Hanburger, having concluded that there was probable cause to believe that the vehicle was occupied by Blottenberger, gave the order to stop the vehicle.

After stopping briefly at the intersection, Harkum turned right on red and began to proceed down the street. At that moment, the agents began a "dynamic vehicle stop" in accordance with their standard procedures in such circumstances, the object of which is to approach the suspect rapidly and forcibly remove him from the car before he has an opportunity to react dangerously. Agent Kornek pulled alongside Harkum's car and Agent Stowe, with gun drawn, ordered Harkum to pull over. Agent Kornek then pulled ahead of Harkum's car and angled in front of it to force Harkum to the side of the road. Agent Sheafe stopped his vehicle directly behind Harkum's vehicle.

As each vehicle came to rest, the agents immediately exited and approached the car with rifles aimed at the occupants. Agent Stowe was the first to arrive at Harkum's car. He approached the passenger side of the car from the front wearing an FBI vest and yelling "police" or "FBI" and "put your hands up." When he arrived at the passenger window, he stood facing Schultz, pointing the gun at him, and continued to identify himself and command the occupants to raise their hands. Agent Kornek also approached from the front and, facing

Harkum, pointed his rifle at her, but Harkum never looked away from Agent Stowe, who was continuously yelling commands from the passenger side of the car. Agent Braga approached the passenger side of the vehicle from the rear, stood behind Schultz, and pointed his gun at the back of Schultz's head, at which point Agent Stowe turned his attention and rifle towards Harkum. Seconds later, Agent Braga fired his weapon through the glass window, striking Schultz in the face. Agent Sheafe, the driver of the rear FBI vehicle, was approaching the car from the rear, but did not arrive at his position until after Agent Braga fired his weapon.[1]

The parties disagree about the events that took place immediately after Agent Braga arrived at Harkum's vehicle. According to Schultz and Harkum, they were both focused on Agent Stowe—who had arrived first and was yelling commands from the passenger side of the vehicle— and immediately raised their hands as he commanded. Agent Stowe tried to open the door, but it was locked. He then backed up a step or two, and ordered the occupants to unlock the door. According to Schultz, "my hands were up and when he said, unlock the door, I moved over to unlock it." J.A. 712. Schultz testified that he moved his "whole upper body so he could see my hands .... [b]ecause he said, keep your hands up." J.A. 712. The door lock was on the door panel next to the handle, which would require Schultz to move his hands towards the right and slightly down to comply. However, Schultz testified that as soon as he started to move to the right, he was shot. Har-

kum testified that she was looking directly at Agent Stowe and, therefore, could see in her line of sight that Schultz was holding his hands up. She also testified that Agent Stowe tried to open the door while telling them to put their hands up, and then told them to unlock the door. Harkum testified that before she could move to unlock the door, there was a loud noise and glass hit her face and legs.

Agent Stowe's testimony is consistent with that of Harkum and Schultz. He confirms that he was the first to reach the car and that he yelled "police" and "show me your hands" several times. J.A. 779. He went straight to the passenger door to open it and drag the suspect out, but found it locked. He then backed up a step or two, looked at the driver, pointed at the driver, and "said, unlock the door." J.A. 780. By that time, Agent Braga had arrived and was a half step behind Agent Stowe on his left side, and Agent Stowe had turned his attention to Harkum. According to Agent Stowe, Agent Braga was yelling "show me your hands," J.A. 781, and Agent Stowe "was telling [Harkum] to unlock the door." J.A. 782. As Harkum was "complying with [Stowe's] demands" and "goes over toward the door lock," "that's when the window exploded" from the gunshot. J.A. 782. He testified that he was focused on Harkum because he knew Agent Braga was watching the suspect.

Harkum estimated that approximately ten seconds elapsed between the time she stopped her car and Schultz was shot. Agent Sheafe, who did not make it into

---

**1.** The movements of the agents are consistent with the testimony regarding standard procedures in a dynamic vehicle stop. Agents Kornek and Sheafe, as the drivers of the FBI vehicles, approached the driver's side of the vehicle from opposite directions, but it is expected that would be slightly behind their

passengers because they must secure their own vehicles before exiting. Thus, Agent Stowe, the first to arrive, focused momentarily on the suspect until Agent Braga arrived from the rear and assumed that duty. Agent Stowe then turned his attention to the driver.

position before the shot was fired, estimated that no more than five seconds passed between the time Agent Braga got out of the FBI vehicle and the window shattered.

Agent Braga's account of these seconds differs from that of Schultz. According to Agent Braga, when he approached the car, Agent Stowe was pointing the gun at the passenger saying "police, FBI, get your hands up." J.A. 210. When he arrived, he also claims to have yelled "numerous times, in a loud voice," J.A. 211, for Schultz to show his hands. Agent Braga testified that he did not hear Agent Stowe yell any commands after he arrived at the car. According to Agent Braga, "Agent Stowe didn't issue any more commands once I had arrived and I was in the better position to address who we thought ... [wa]s Blottenberger." J.A. 212. He denied ever hearing Agent Stowe command the occupants to unlock the car doors. Agent Braga testified that Schultz did not have his hands up and refused to show his hands after being instructed to do so four or five times. According to Agent Braga, there was "no response at all," and instead of complying with the order to show his hands, "the passenger turn-[ed] towards the console area and lean[ed] forward, as if he's reaching down, into the—between the seats, the console area," J.A. 215, "as if he's looking down and reaching down to grab something." J.A. 216. Agent Braga testified that he fired the shot because he believed, based upon the passenger's non-compliant movement to the left, that the passenger was going for a gun to shoot the agents and possibly the driver and himself. Agent Braga estimated that approximately 20 to 30 seconds elapsed between the time Schultz was ordered to raise his hands and the time the shot was fired.

Immediately after the shooting, Schultz and Harkum were dragged from the car and handcuffed. Agent Brosnan and King then arrived at the scene and realized that Schultz and Harkum had been mistaken for Blottenberger and his girlfriend. It was later determined that the bullet fired by Agent Braga struck the glass of the car window and the seatbelt "d-ring" located inside the passenger compartment, causing fragments to ricochet and enter Schultz's face. As a result of the shooting, Schultz sustained multiple fractures and other injuries to his head, face and mouth, which necessitated reconstructive surgery. Harkum sustained psychological injuries, including depression, anxiety, and post-traumatic stress disorder.

In March 2003, Schultz and Harkum brought separate *Bivens* actions against Agents Brosnan, Hanburger, and Braga, alleging that the agents violated their Fourth Amendment rights by seizing them without probable cause, and that Agent Braga unconstitutionally employed excessive force when he fired his rifle. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 389, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (holding that violation of the Fourth Amendment right "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct"). The cases were consolidated by the district court, and defendants filed a motion to dismiss based upon qualified immunity. The district court granted Agent Brosnan's motion in its entirety, granted the motion of Agent Hanburger, except for the claim that Hanburger's order to stop the car was without probable cause, and denied the motion of Agent Braga on the excessive force claim. *See Schultz v. Braga,* 290 F.Supp.2d 637 (D.Md.2003).

Following discovery, Agents Braga and Hanburger filed motions for summary judgment, again on the ground that they were entitled to qualified immunity. The

district court granted Agent Hanburger summary judgment on the remaining claim against him. With regard to Agent Braga, the district court concluded that there were genuine issues of material fact regarding the circumstances surrounding Agent Braga's use of force against Schultz and denied Agent Braga's motion as to Schultz's claim. However, the district court granted Agent Braga's motion as to Harkum's claim because she had failed to demonstrate that Agent Braga violated her Fourth Amendment right by seizing her by means of the alleged excessive force. The district then certified its decision regarding her claim for interlocutory appeal along with Agent Braga's appeal from the decision in Schultz's case.

## II.

We begin with Agent Braga's appeal from the district court's denial of his motion for qualified immunity from Schultz's claim of excessive force.

### A.

Under the doctrine of qualified immunity, police officers performing discretionary duties "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

When qualified immunity is asserted, the court must consider the requisites of the defense in the proper sequence. *See Saucier*, 533 U.S. at 200, 121 S.Ct. 2151. We must first evaluate whether, viewing the facts in the light most favorable to the plaintiff, the officer has violated a particular constitutional right; if so, we proceed to determine whether that right was clearly established at the time of the violation. *See id.* With regard to the latter question, the relevant inquiry is whether "it would be clear to an objectively reasonable officer that his conduct violated [the constitutional] right." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir.2002).

■ Because "[q]ualified immunity is an entitlement not to stand trial or face the other burdens of litigation ... rather than a mere defense to liability," it is important to "resolv[e] immunity questions at the earliest possible stage in litigation." *Saucier*, 533 U.S. at 200–01, 121 S.Ct. 2151 (internal quotation marks and citations omitted). Ordinarily, this would be at the summary judgment stage. *See Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir.2005). However, qualified immunity does not "override the ordinary rules applicable to summary judgment proceedings." *Id.* at 559. "[T]he purely legal question of whether the constitutional right at issue was clearly established' is always capable of decision at the summary judgment stage,'" but "a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred ... must be reserved for trial.'" *Id.* (quoting *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir.1992)).

In this case, the constitutional right in question is plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures, which encompasses the right to be free of arrests, investigatory stops, or other seizures effectuated by excessive force. *See Graham v. Connor*,

490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). A claim that a law enforcement officer used excessive force in the context of a seizure is analyzed under the "objective reasonableness" standard of the Fourth Amendment. *Id.* An officer's actions are not excessive if they "are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865.

"To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances." *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir.1994). "Subjective factors involving the officer's motives, intent, or propensities are not relevant." *Id.* at 173. However, "the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." *Id.*

> Such a perspective serves two purposes. First, using the officer's perception of the facts at the time limits second-guessing the reasonableness of actions with the benefit of 20/20 hindsight. Second, using this perspective limits the need for decision-makers to sort through conflicting versions of the "actual" facts, and allows them to focus instead on what the police officer reasonably perceived. In sum, the officer's subjective state of mind is not relevant to the qualified immunity inquiry, but his perceptions of the objective facts of the incident in question are.

*Id.* (citations omitted).

Determining the reasonableness of the challenged actions ultimately "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865

(citation and internal quotation marks omitted). Proper application of the test of reasonableness also "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "Because 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving,' the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided." *Waterman v. Batton*, 393 F.3d 471, 476–77 (4th Cir.2005) (quoting *Graham*, 490 U.S. at 397, 109 S.Ct. 1865) (internal citation omitted).

 Nevertheless, "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). And it is a clearly established principle of law that law enforcement officers may employ deadly force "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* at 11, 105 S.Ct. 1694. "Where [a] suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* But "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12, 105 S.Ct. 1694.

## B.

■ Here, the FBI's decision to stop Harkum's car unquestionably implicated significant governmental interests. The agents were charged with arresting Blottenberger, a known drug addict with an extensive criminal record, who was reported to be armed, dangerous, possibly suicidal, and in the process of fleeing capture for an armed bank robbery. Agent Braga and his colleagues reasonably believed that the occupants of the vehicle were Blottenberger and his girlfriend, and they had probable cause to stop the car and seize the occupants. Accordingly, our evaluation of Agent Braga's use of deadly force must be viewed from this perspective, without regard to the fact that the occupants of the vehicle were later discovered to be an innocent couple tragically mistaken to be the suspect Blottenberger and his girlfriend Lisa. *See Mazuz v. Maryland*, 442 F.3d 217, 225 (4th Cir.2006) (" 'Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.' ") (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)).

Despite the serious and dangerous nature of the situation at hand, however, genuine issues of material fact remain as to whether Schultz was making a noncompliant, dangerous movement in the split second before Agent Braga fired his gun and whether Agent Braga, when he responded with deadly force to Schultz's movements, "ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm" to the agents or to Harkum. *Garner*, 471 U.S. at 11, 105 S.Ct. 1694.

As an initial matter, we note that Schultz claims that he was moving his whole upper body, hands raised, *right* towards the door handle to unlock the door as commanded by Agent Stowe. By contrast, Agent Braga contends that the suspect failed to comply with repeated commands to raise his hands and moved his body to the *left*, towards the inner console of the car, with his hands down as if to retrieve a gun between the seats. Fearing that the suspect might attempt to shoot the agents, or perhaps even the driver and himself, Agent Braga argues that he reasonably employed deadly force to stop Schultz's noncompliant movement.[2] Thus, the factual circumstances prompting Agent Braga's use of deadly force are very much in dispute.

For his part, Agent Braga acknowledges that there is a genuine dispute between the parties as to whether Schultz moved left or right after Agent Braga arrived at the car and shouted orders for him to put his hands up. However, Agent Braga contends that he is entitled to qualified immunity because, even assuming Schultz's version of the facts to be true (as we must), it would still have been objectively reasonable for an officer to fire upon a suspect who, after being repeatedly instructed to keep his hands up and in full view, instead moved his hands to the right and downward. Agent Braga further contends that, even if Agent Stowe shouted a conflicting command with which Schultz was comply-

**2.** *See e.g., Anderson v. Russell,* 247 F.3d 125, 132 (4th Cir.2001) (holding that shooting of suspect who initially complied with officers' order to raise his hands, but then lowered them without explanation, was objectively reasonable as a matter of law, even though it turned out that the suspect had not been reaching for a weapon); *McLenagan v. Karnes,* 27 F.3d 1002, 1007–08 (4th Cir.1994) (noting that a noncompliant movement indicating the presence of a weapon may justify the use of deadly force).

ing, it was objectively reasonable for Braga not to have heard it or for the command not to have registered as a conflicting command under the tense, uncertain, and exigent circumstances present at the time.

Although we do appreciate the tense nature of the situation at hand, the issue before us on summary judgment is fairly narrow. We determine only whether, viewing the evidence in the light most favorable to Schultz, we can say, *as a matter of law*, that a reasonable police officer in Agent Braga's position could have believed that the suspect was making a noncompliant movement that "pose[d] a threat of serious physical harm, either to the officer or to others," warranting the use of deadly force. *Id.* We are unable to do so here. Viewing the evidence in the light most favorable to Schultz, Agent Braga fired his weapon between five to ten seconds after exiting his vehicle. During this time, Schultz raised his hands, in plain view of the agents, and kept them raised until ordered by Agent Stowe to unlock the door. Agent Stowe was standing approximately 18 inches from Agent Braga when Agent Stowe gave the command to unlock the door in a voice that was at least loud enough for both Harkum and Schultz to hear it inside the vehicle with the windows rolled up. Yet, Agent Braga shot Schultz immediately upon the latter moving his raised hands and upper body towards the right side of vehicle to comply with Agent Stowe's command.

In sum, there remain genuine issues of material fact as to the circumstances leading up to Agent Braga's decision to fire his weapon at Schultz, including whether Agent Braga heard and registered the conflicting command of Agent Stowe to unlock the door and whether, in view of the conflicting command and all of the other facts and circumstances surrounding it, a reasonable officer in Agent Braga's position could have believed that Schultz was making a noncompliant, dangerous movement warranting the use of deadly force to protect himself and others from an immediate and deadly threat. There are, undoubtedly, a number of other factual scenarios that the jury might endorse under which Agent Braga might still be entitled to qualified immunity as a matter of law, but these are matters for the district court to revisit, where appropriate, on remand. "We decide[ ] only that the forecasted evidence, *when viewed in the light most favorable to [Schultz]*, established a violation of clearly established law." *Willingham,* 412 F.3d at 559 (emphasis in original). "Because we d[o] not decide what a reasonable officer would have known regarding the lawfulness of his actions under any *other* version of events, the qualified immunity defense remain[s] viable after our decision." *Id.* (emphasis added). "[T]he district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." *Id.* at 560.

### III.

We now turn to Harkum's appeal from the district court's grant of qualified immunity to Agent Braga on her Fourth Amendment claim. The district court ruled that Harkum could not prevail on her claim of excessive force because she was not "seized" by Agent Braga within the meaning of the Fourth Amendment in the first instance. We agree.

### A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. Persons seized by a federal agent in an unreasonable manner, such as by excessive

force, may sue the agent personally and recover monetary damages against him, see *Bivens*, 403 U.S. at 389, 91 S.Ct. 1999, so long as "it would be clear to an objectively reasonable officer that his conduct violated" the Fourth Amendment. *Brown*, 278 F.3d at 367. Only if the plaintiff can first establish that she has been "seized" within the meaning of the Fourth Amendment by means of excessive force do we proceed to a determination of whether the force employed was "objectively unreasonable" under the circumstances.

It is well established that "not all personal intercourse between policemen and citizens involves 'seizures' of persons" for purposes of the Fourth Amendment. *United States v. Mendenhall*, 446 U.S. 544, 552, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (internal quotation marks omitted). Rather, it is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen" that we may "conclude that a 'seizure' has occurred." *Id.* (internal quotation marks omitted). Liberty has been restrained, and "a person has been 'seized' within the meaning of the Fourth Amendment ... if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554, 100 S.Ct. 1870 (footnote omitted).

Because a seizure within the meaning of the Fourth Amendment always "requires an intentional acquisition of physical control," *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), it does not extend to "accidental effects" or "unintended consequences of government action." *Id.* Although a seizure may "occur[ ] even when an unintended person or thing is the object of the detention or taking, ... the detention or taking [of the person or thing] itself must be willful. This is implicit in the word

'seizure,' which can hardly be applied to an unknowing act." *Id.*

Relying upon *Brower*, we have declined to extend the protections of the Fourth Amendment to an innocent bystander, who was unintentionally killed by a police officer attempting to seize a fleeing criminal. Because the victim "was not the intended object of the shooting by which he was injured," he had not been " 'seized' within contemplation of the fourth amendment." *Rucker v. Harford County, Md.*, 946 F.2d 278, 281 (4th Cir.1991). And, other courts have similarly refused to allow hostages to bring Fourth Amendment claims against police officers who accidentally shot them while attempting to seize their captors, even though the means applied (the gunfire) was intentional, because there was no intent to seize the hostage. *See Childress v. City of Arapaho*, 210 F.3d 1154, 1157 (10th Cir.2000) (holding that innocent hostages injured by police gunfire could not bring an action under the Fourth Amendment because there was no intent to "seize" the hostages); *Medeiros v. O'Connell*, 150 F.3d 164, 168–69 (2d Cir.1998) (holding that no Fourth Amendment seizure occurred when a hostage was injured by police gunfire because the victim was not the object of an intentional act of seizure); *Landol–Rivera v. Cosme*, 906 F.2d 791, 798 (1st Cir.1990) (holding that the Fourth Amendment is not implicated when a hostage is inadvertently shot during a police pursuit of a robbery suspect because "the individual alleging harm was [not] the object of the challenged police conduct").

■ In sum, "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement," such as in the case of an innocent passerby who is injured when he is inadvertently struck by the force employed, "nor even whenever

there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement," such as in the case of a fleeing felon who is unknowingly and unintentionally stopped by an officer. *Brower*, 489 U.S. at 596–97, 109 S.Ct. 1378 (emphasis in original). Rather, a Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement through means intentionally applied." *Id.* at 597, 109 S.Ct. 1378 (emphasis omitted). It is not necessary that the seizure be effectuated exactly as intended when the force is applied, but the person must nonetheless have been "stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599, 109 S.Ct. 1378.

### B.

In this case, Harkum first asserts that her Fourth Amendment right to be free from a seizure effectuated by excessive force was violated when Agent Braga fired his rifle at her passenger because she had not yet submitted to the agents' authority when the shot was fired. In other words, Harkum contends that it was Agent Braga's gunshot that ended her freedom of movement and accomplished her seizure. However, the evidence, viewed in the light most favorable to Harkum, simply does not support this version of the facts. Harkum was forced to the side of the road by Agent Kornek and moments later was held by Agents Kornek and Stowe at gunpoint. Although Harkum did not initially understand that the persons forcing her off the road were law enforcement officers, she recognized that Agent Stowe wore an identifying FBI vest when he exited his vehicle and approached her, and Agent Stowe continuously identified himself as "FBI" or police as he approached. According to Harkum, Agent Stowe alone gave commands to her, she only looked in his direction, and she was either moving to comply with Agent Stowe's command or intending to do so when the shot was fired. Clearly, when Harkum pulled over, stopped the car, and raised her hands in compliance with the Agent Stowe's orders, she was acknowledging the agents' authority over her and their seizure of her for purposes of the Fourth Amendment was complete. *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870 (noting as "[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, ... the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled").

Nor did Agent Braga intend to seize Harkum when he fired his weapon. Agent Braga was not driving the car that forced Harkum's vehicle to the side of the road, never pointed his weapon at Harkum, and never issued any commands to her. From the moment he exited his vehicle, Agent Braga's intent was to seize the robbery suspect sitting in the passenger seat of the vehicle. Additionally, Agent Braga intentionally angled himself to the back of the passenger, as he was trained to do, so as *not* to endanger the driver of the vehicle. Moreover, Agent Braga did not remove Harkum from the car, handcuff her, or detain her in any other way after he fired his weapon at Schultz. In sum, because Harkum was seized before Agent Braga fired his weapon and Agent Braga had no intent to seize Harkum by firing his weapon, Agent Braga's firing of his weapon on the other side of the vehicle cannot reasonably be viewed as the act which brought Harkum into submission and terminated her freedom.

C.

■ Harkum next contends that, even if she had been "seized" by the other officers before Agent Braga fired his weapon and Agent Braga did not intend to seize her by virtue of the firing of his weapon, she may nevertheless recover from Agent Braga because it was reasonably foreseeable to Agent Braga that a bullet might ricochet and strike her when he fired at Schultz. Harkum argues that, unlike in the case of an innocent bystander or hostage, she was an intended target of seizure by the FBI agents and is entitled to recover for any injuries (including purely emotional injuries) she sustained as a result of Agent Braga firing his weapon at Schultz.

■ The fatal flaw in Harkum's argument, however, is that the Fourth Amendment does not protect persons who were merely "reasonably foreseeable victims" of excessive force inflicted upon another, even if they were themselves targets of a seizure. The Fourth Amendment protects persons who have been *personally* subjected to a "governmental termination of freedom of movement through means intentionally applied" that are unreasonable. *Brower*, 489 U.S. at 597, 109 S.Ct. 1378 (emphasis omitted). In short, it protects persons who are *actually* seized by unreasonable means.

Harkum's reliance upon cases from other circuits which have allowed suspects to pursue Fourth Amendment claims of excessive force against police officers who inadvertently shot them are not to the contrary. In each case, an excessive force

claim was allowed to proceed *not* because the plaintiff was a "foreseeable victim" of the officer's gunfire, but because each was a desired target of seizure *and* each was, in fact, stopped or "seized" by the bullet intentionally fired by the officer. *See, e.g., Vaughan v. Cox*, 343 F.3d 1323, 1329 (11th Cir.2003) (allowing claim of passenger who was shot by officer firing at fleeing vehicle's driver because the officer fired his weapon to stop both men and the plaintiff "was hit by a bullet that was meant to stop him," *i.e.*, he was " 'stopped by the very instrumentality set in motion or put in place in order to achieve that result' ") (quoting *Brower*, 489 U.S. at 599, 109 S.Ct. 1378); *Fisher v. City of Memphis*, 234 F.3d 312, 318–19 (6th Cir.2000) (allowing claim of passenger who was shot when the officer fired his gun through the driver's window of a fleeing car because the passenger was also "a deliberate object of the[ ] exertion of force" and "[b]y shooting at the driver of the moving car, [the officer] intended to stop the car, effectively seizing everyone inside, including the [p]laintiff") (citation and internal quotation marks omitted); *see also Yang v. Murphy*, 796 F.Supp. 1245, 1250 (D.Minn.1992) (allowing plaintiff's claim to proceed because the officer intended to apprehend two fleeing suspects and, although he aimed at the other suspect and hit the plaintiff's decedent, he nonetheless seized an intended target by the means intentionally applied).[3]

Harkum's reliance upon the case of *Flores v. City of Palacios*, 381 F.3d 391 (5th Cir.2004), is similarly misplaced.

---

3. *Craighead v. Lee*, 399 F.3d 954 (8th Cir. 2005), also relied upon by Harkum, is not analogous to the case at hand. There, the court allowed a Fourth Amendment claim to proceed in a case where an officer indiscriminately fired upon two men struggling over a gun even though he knew that one was an innocent person whom the suspect had attempted to rob. The officer did not contend

that the plaintiff was not "seized" for purposes of the Fourth Amendment, but rather that his use of deadly force was reasonable under the circumstances. But even if the officer had challenged the "seizure," the case would not aid Harkum. The evidence, viewed in the light most favorable to the victim, demonstrated that the officer intentionally fired upon both men.

There, the court allowed a Fourth Amendment claim to proceed for purely psychological injuries caused by an officer firing upon and striking a young woman's vehicle, but not her person. The gunfire, however, was directed at the plaintiff's vehicle for the purpose of stopping the car and terminating her freedom, and it had the desired effect of doing so.

Although Flores was not struck by the officer's bullet, she was nonetheless an intended target of the force employed and her freedom of movement was terminated by that show of force. *See id.* at 396 (noting that "the termination of [plaintiff's] freedom of movement was accomplished by exactly the means [the officer] intentionally applied, i.e., the shot to her car").

For the same reason, we need not tarry with Harkum's argument that the district court erred in finding that she had to have been struck by the bullet in order to state a Fourth Amendment claim and her related claim that, if a physical touching is required, she was touched by the blood and glass set in motion by the gunshot. Contrary to Harkum's argument, the district court did not distinguish Harkum from Schultz solely because she was not physically struck by the bullet, nor do we. Harkum's claim is distinguishable from Schultz's claim because the force employed was not directed towards her, not intended to seize her, and did not seize her. Nor have we held today that a suspect must be physically struck by a bullet (or any other object) to state a claim for excessive force. But, to hold an officer personally liable for violation of the Fourth Amendment, the plaintiff must at a minimum be able to demonstrate that the officer actually terminated her freedom of movement by means of the alleged excessive force.

### D.

Here, Harkum seeks to extend the scope of the Fourth Amendment protections to persons who are "reasonably foreseeable" victims of excessive force inflicted upon another, even though they are not actual victims of a seizure effectuated by that force. Like the district court, we decline to stretch the scope of the Fourth Amendment so far beyond its plain language and intended purpose. *See Brower,* 489 U.S. at 596, 109 S.Ct. 1378 (noting that "[t]he writs of assistance that were the principal grievance against which the Fourth Amendment was directed, did not involve unintended consequences of government action") (internal citation omitted). Agent Braga did not intend to terminate Harkum's freedom of movement by firing the shot, nor did the firing of the shot terminate Harkum's freedom of movement. Thus, Agent Braga did not terminate Harkum's "freedom of movement through means intentionally applied," *id.* at 597, 109 S.Ct. 1378 (emphasis omitted), and Harkum was not "stopped by the very instrumentality set in motion or put in place in order to achieve that result," *id.* at 599, 109 S.Ct. 1378. Accordingly, the district court correctly granted Agent Braga qualified immunity from Harkum's claim of excessive force under the Fourth Amendment.

### IV.

For the foregoing reasons, we affirm the district court's order denying Agent Braga's motion for summary judgment as to Schultz's claims, but granting Agent Braga's motion for summary judgment as to Harkum's claims.

*AFFIRMED.*