**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-1569

CHARLES ALFORD,

Plaintiff - Appellant,

versus

CUMBERLAND COUNTY, NORTH CAROLINA; CUMBERLAND
COUNTY SHERIFF'S DEPARTMENT; EARL L. BUTLER,
Sheriff; CUYLER LARUE WINDHAM, JR.,
Individually, and in his official capacity as
an Officer of the Cumberland County Sheriff's
Department,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern
District of North Carolina, at New Bern.  Louise W. Flanagan, Chief
District Judge.  (5:04-cv-00108-FL)

Argued:  May 22, 2007                  Decided:  October 15, 2007

Before WILLIAMS, Chief Judge, GREGORY, Circuit Judge, and Benson
Everett LEGG, Chief United States District Judge for the District
of Maryland, sitting by designation.

Affirmed by unpublished opinion.  Judge Legg wrote the majority
opinion, in which Chief Judge Williams concurred.  Judge Gregory
wrote an opinion concurring in part and dissenting in part.

**ARGUED**: Michael Louis Goldberg, ROGERS & GOLDBERG, L.L.C., Atlanta,
Georgia, for Appellant.  Reginald B. Gillespie, Jr., FAISON &
GILLESPIE, Durham, North Carolina; Ronnie Monroe Mitchell,

MITCHELL, BREWER, RICHARDSON, ADAMS, BURGE & BOUGHMAN, Fayetteville, North Carolina, for Appellees. **ON BRIEF:** Douglas E. Canders, Grainger R. Barrett, CUMBERLAND COUNTY ATTORNEY'S OFFICE, Fayetteville, North Carolina, for Appellees Cumberland County, North Carolina, Cumberland County Sheriff's Department, and Earl L. Butler, Sheriff.

---

Unpublished opinions are not binding precedent in this circuit.

LEGG, Chief District Judge:

Charles Alford ("Alford"), who was shot in the confusion of a drug raid, filed the instant civil rights suit. Alleging the use of excessive force, he sued the officer who shot him, Sgt. Cuyler Larue Windham, Jr. ("Windham"). Following discovery, Windham moved for summary judgment on the ground of qualified immunity. The district court granted the motion. The court also dismissed Alford's state law claims and his claim that defendant Earl L. Butler ("Butler"), the Sheriff of Cumberland County, failed to train and supervise his deputies properly.[1] This appeal followed. We affirm the district court's decision.

## I.

As will be discussed, many of the facts surrounding the raid are contested. The following facts, however, are not reasonably in dispute.

During the early evening of February 27, 2003, members of the Sheriff's Office Special Response Team ("SR Team") prepared to execute a federal search warrant at a mobile home where crack and powder cocaine were being sold. Briefers advised the SR Team that

---

[1]Prior to discovery, the district court dismissed (1) Alford's § 1983 claims against Cumberland County and the Cumberland County Sheriff's Department ("CCSD"), (2) his punitive damages claims against Cumberland County and the CCSD, (3) his respondeat superior claim against the CCSD, and (4) his claims against Windham in his official capacity. Alford did not appeal the dismissal of these claims.

Janet Alford ("Janet") lived in the home with her two adult children, Lakina Alford ("Lakina") and Garry Alford ("Garry"). Janet, Lakina, and Garry all had drug convictions. Although Alford denies the accuracy of the report, the briefer also advised the SR Team that shots had been fired at the house a week before.

The officers assembled at a spot where they could observe the house without being detected. They observed foot and car traffic to and from the house. (J.A. at 245.)[2] At around 7:30 p.m., a police informant, Beverly Hendrix, entered the house to buy crack cocaine. She left the house a half an hour later, met the officers, and handed over the drugs. Hendrix advised her contact, Officer Gary Owens, that there were nine people, including two children, in the small house.

Several minutes later, six members of the SR Team approached the front door. According to the officers, Corporal Paul Spiegler ("Spiegler") repeatedly banged on the side of the trailer, shouting, "Sheriff's Office, search warrant." There was no response, except for the sound of footsteps inside. The officers then struck the front door with a battering ram, forcing it open

_____

[2]Citations to the "J.A." and "S.A." refer, respectively, to the contents of the joint appendix and supplemental joint appendix filed by the parties in this appeal.

4

eight to twelve inches. Someone inside the trailer, apparently Willie Alford, the plaintiff's father, slammed the door shut.[3]

Upon meeting resistance at the front door, the officers ran to the rear of the trailer and lined up at the back door. Sergeant Charles Parker ("Parker") kicked it open. Deputy Paul Meade ("Meade") tossed a flashbang grenade into a small laundry room just inside the entrance. The grenade detonated, producing a loud, disorienting noise, a flash of light, and obscuring smoke.

Hard on the heels of the flashbang grenade, the officers entered the trailer in the following order: Parker, Meade, Windham, Officer David Borreson, Deputy John Leggette ("Leggette"), and Spiegler. Parker, the first officer inside, went through the laundry room and turned left into the kitchen. Meade, a few seconds behind, went through the laundry room and turned right into a bedroom. Windham and Leggette followed Parker into the kitchen, while the other officers followed Meade into the bedroom. Windham was armed with a machine pistol that he carried in his right hand. The pistol was supported by a strap that hung from his left shoulder and ran across his body.

---

[3]Neither Willie Alford nor anyone else in the house reported hearing the officers identify themselves as police. At the time of the raid, Charles Alford was playing solitaire on a computer some eight feet from the front door. During his deposition, Alford could not recall whether he heard banging and shouting at the front door.

The officers shouted "Get down" as they breached the house.[4] Shortly after Windham entered the kitchen, he encountered Alford coming towards him, arms outstretched. Alford did not live in the trailer, but was visiting. Windham moved towards Alford, and, a few seconds later, fired a burst of three shots. Alford was struck in the right arm and abdomen. The shot that hit Alford's right forearm also grazed his right hand. According to the uncontroverted forensic report, the muzzle of the pistol was no more than twelve inches from Alford's forearm when the shot was fired. (S.A. at 252UU.) Alford's right hand must have been even closer.

Although the parties agree on the basic facts outlined above, they disagree on other events surrounding the shooting. Windham's description of the events that occurred after he entered the trailer is as follows. Windham testified on deposition that as soon as he turned into the kitchen, he saw Lakina standing by the

---

[4]Windham and Parker both testified that they shouted "get down." Although Alford does not remember hearing this (J.A. at 442), his father testified that the officers shouted, "Get down on the floor all of you. I'll kill all of you M.F.S.B.'s." (J.A. at 690.) Because there is no genuine dispute, we will assume for the purposes of this summary judgment motion that the officers did order the occupants of the house to get down.

It is, however, disputed whether the officers identified themselves as they entered through the back door. The officers stated that they did, but Alford's father and thirteen-year-old nephew both claim that they did not. (J.A. at 691, 804.) Construing the record favorably to Alford, the court will assume that the officers did not announce themselves as police officers.

6

stove.  He ordered her to the ground.  When Lakina failed to comply, he placed his left hand on her neck and attempted to force her down.  She resisted and remained on her feet.

While Windham was trying to force Lakina to the ground, he noticed Alford, who was seven to ten feet away, approaching from the living room.  Alford was not running, and he did not appear to be carrying a weapon.  Windham began moving in Alford's direction, demanding that he get down.  As Windham and Alford converged, Lakina jumped on Windham's back.  Although distracted by Lakina, Windham grabbed Alford's right shoulder with his left hand and tried to force Alford to the ground.  Alford resisted, remained standing, and jostled Windham's gun.  In fear that his gun would be taken and turned against the officers, Windham depressed the trigger, releasing a three-shot burst.

Alford and Lakina's description of the events inside the trailer conflicts with Windham's.  Alford testified on deposition that when he heard the flashbang grenade detonate, he stood up and began "running" towards the kitchen to investigate.  He encountered his eight-year old niece, Makayla, who was screaming and running through the kitchen.  As he reached for Makayla, someone hit him in the upper lip.  Until he felt the blow, which "knocked [him] backwards," (J.A. at 440),[5] he did not realize that strangers were

_____

[5]It is not clear what Alford meant when he testified that he was "knocked backwards."  He stated that he did not remember taking any steps back.  (J.A. at 441.)

7

in the house.  Two seconds later, Alford was struck by bullets.  He believes that the officer who shot him was not the officer who hit him on the lip.  Alford denies touching or attempting to grab Windham's gun.  Likewise, Lakina denies jumping on Windham's back.

Alford brought suit on February 28, 2004, asserting (1) a § 1983 claim against Windham for violating his constitutional rights, (2) state law claims against Windham, and (3) § 1983 and state law claims against Butler.[6]  The district court found that Windham was entitled to qualified immunity on the § 1983 claim because Windham reasonably perceived that Alford posed a threat.  The district court granted summary judgment on the other claims based on the same reasoning.  Alford now appeals.

II.

A.

Law enforcement officers accused of using excessive force enjoy qualified immunity when sued under 42 U.S.C. § 1983.  Qualified immunity is an entitlement not to stand trial or face other burdens of litigation.  See Schultz v. Braga, 455 F.3d 470, 476 (4th Cir. 2006).  The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at

---

[6]As discussed, Alford brought other claims that are not involved in this appeal because he does not contest their dismissal.  See supra note 1.

8

the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam).

Determining whether qualified immunity applies is a matter of law for the court to decide. See Schultz, 455 F.3d at 479. In some cases, the decision is made in connection with a motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6). Most often, however, qualified immunity is tested at the summary judgment stage after the facts have been developed through discovery.[7]

A court must evaluate the requisites of a qualified immunity defense "in proper sequence." Saucier v. Katz, 533 U.S. 194, 200 (2001). The threshold question is whether the facts, viewed in the light most favorable to the plaintiff, demonstrate a constitutional violation. Id. at 201. If no constitutional violation occurred, the inquiry ends and the immunity applies. If, however, the facts support a constitutional violation, "the next, sequential step is to ask whether the right was clearly established." Id. If not, the defendant is entitled to qualified immunity. If, on the other hand, the right was clearly established, qualified immunity is

---

[7]Qualified immunity can also be applied after trial. "[T]o the extent that a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." Willingham v. Crooke, 412 F.3d 553, 560 (4th Cir. 2005).

inapplicable.  The case must proceed to trial for resolution of the factual disputes.

In an excessive force case, an officer is entitled to qualified immunity if he acted reasonably under the circumstances confronting him.  See Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994).[8]  The inquiry is objective in the sense that it disregards the officer's motives.  In other words, an officer who uses a reasonable degree of force is protected even if he acts maliciously.  Conversely, an officer whose motives are pure is not entitled to qualified immunity if he uses unreasonable force.[9]

When measuring reasonableness, "the use of hindsight must be avoided."  Waterman v. Batton, 393 F.3d 471, 477 (4th Cir. 2005).  A court must place the officer in the context confronting him.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgements-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation."  Graham v. Connor, 490 U.S. 386, 396-97 (1989).

---

[8]The qualified immunity test is not always an objective one.  For example, a selective enforcement case hinges on the subjective motivations of the state official.  See Butler v. Cooper, 554 F.2d 645, 646 (4th Cir. 1977).

[9]"Subjective factors involving the officer's motives, intent, or propensities are not relevant."  Rowland v. Perry, 41 F.3d 167, 172 (4th Cir. 1994). The court looks at the officer's actions "in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation."  Graham v. Connor, 490 U.S. 386, 388 (1989).

10

Although the immunity inquiry is objective, it "must be filtered through the lens of the officer's perceptions at the time of the incident in question." Rowland, 41 F.3d at 173. This allows the court to focus on what the officer "reasonably perceived." Id.

The Supreme Court has stated that determining reasonableness "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396. In an excessive force case, this inquiry requires balancing the degree of force used against the danger posed to the officer and to others. Windham used deadly force. Deadly force is permissible "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Tennessee v. Garner, 471 U.S. 1, 11 (1985).

In applying the qualified immunity test, the district court stated that "[t]he only issue relevant for this court's decision is whether or not defendant Windham's perception of [Alford's] movement as aggressive was reasonable." (J.A. at 149.) In answering this question, the court held that the circumstances facing Windham could have raised a reasonable belief that his "weapon may be taken." Id. We review the district court's decision de novo. See Suarez Corp. Industries v. McGraw, 202 F.3d 676, 684 (4th Cir. 2000).

11

B.

On appeal, Alford argues that "an officer is not entitled to qualified immunity in shooting an unarmed man when the facts upon which the officer bases his belief that the suspect posed a threat of harm are contradicted by other evidence in the case." (Appellant's Br. at 16.) As Alford points out, Windham's fear that his gun might be turned against him and his fellow officers was created in large measure by Lakina's alleged attack from behind and Alford's alleged jostling of his gun. Both of these allegations are vigorously disputed.

Alford argues that these discrepancies generate a credibility contest that a jury must decide in order to determine Windham's true motivation for shooting him. This argument misperceives the qualified immunity test. The test is objective, meaning that Windham's subjective motivation is irrelevant. The task that the court must accomplish at the summary judgment stage is to reconstruct the record by resolving all factual disputes in plaintiff's favor. This means, for example, that the court must assume arguendo that Lakina did not jump on Windham's back and that Alford did not jostle Windham's gun. The Court must next view the reconstructed record in the light most favorable to the plaintiff.

Having taken these two steps, the Court must then ask whether a reasonable officer in Windham's position could have believed that his gun was threatened. The Court does not inquire whether Windham

12

himself believed that his gun was threatened.  Instead, the focus is on a hypothetical reasonable officer facing the situation (reconstructed in plaintiff's favor) that Windham faced.

We agree with the district court's decision.  A reasonable officer in Windham's position would have approached the trailer with the following set of assumptions in mind: (1) as confirmed by the "controlled buy," the Alfords were selling cocaine from their trailer; (2) at least three of the trailer's residents had drug convictions; (3) shots had been fired in the vicinity of the trailer the previous week, and (4) as many as nine people were in the small trailer, presenting a tactical challenge.

As the raid unfolded, a reasonable officer in Windham's position would have observed the following: (1) someone in the trailer actively resisted the officers' attempt to get in through the front door; (2) because of the delay in gaining entry, the officers had lost the element of surprise, making the situation more dangerous; (3) the officers, on entering the house, barked instructions to "get down;" (4) by remaining on his feet, Alford appeared to be ignoring those orders; (5) Alford's arms were outstretched;  (6) based on the uncontroverted forensics, Alford's right hand was within inches of the muzzle of Windham's machine pistol, and  (7) if turned against the officers, the machine pistol would have been a formidable weapon.

13

Alford contends that other factors would have caused any reasonable officer to stop before pulling the trigger. Alford points to the following: (1) Alford was unarmed; (2) he was not moving directly towards Windham; (3) he was neither overtly menacing nor even looking at Windham; (4) a reasonable officer would know that the chaos of a raid may render an individual unable to follow a directive to get on the floor; (5) there was a small child in the vicinity whom Alford may have been trying to protect, and (6) either Windham or another officer hit Alford, knocking him away from Windham and stunning him.

The points Alford makes do not undercut Windham's case for qualified immunity. Given sufficient time to reflect, a reasonable officer may well have stayed his hand. The volatile, threatening situation facing Windham, however, did not afford time for reflection. A reasonable police officer could have believed that "[i]f [he] paused for even a instant, [he] risked losing [his] last chance to defend [himself]." Waterman, 393 F.3d at 478.

The cases that Alford relies on do not invalidate this analysis. Two of those cases merit discussion.

The first is Clem v. Corbeau, 284 F.3d 543 (4th Cir. 2002), in which we affirmed the district court's denial of qualified immunity. In that case, two officers responded to a call placed by Aster Clem about her husband, Robert Clem ("Clem"). She explained that her 58-year-old husband was suffering from dementia and various physical

14

problems, was refusing to take his medicine, had not eaten for three days, and refused to seek medical attention. Although initially calm, Clem grew agitated, sufficiently so that the officers attempted to subdue him with pepper spray. After being sprayed, Clem began moving towards one of the officers, Shannon Corbeau ("Corbeau"). As described in the opinion, Clem was "'stomping' forward in a 'very odd' manner like a 'robot,' with his hands open and waiving in front of him." Without giving warning, Corbeau shot Clem, who proved to be unarmed.

Corbeau later claimed that the shooting was justified. He explained that Clem had earlier threatened him and patted a pocket as if to suggest he had a weapon. Corbeau also claimed that, on the way to the Clem house, a dispatcher had informed him that Clem had threatened his wife with a knife five weeks earlier.

Although Clem, like Alford, was advancing toward an officer when he was shot, the similarities between the two cases end there. Having spent time with Clem before the shooting, Corbeau knew that Clem, although potentially unpredictable, was a mentally disabled man who was past middle age and appeared feeble. Nothing in the case suggests that Clem was attempting to seize Corbeau's gun or even that Clem was close enough to pose an immediate threat. Unlike Windham, Corbeau had the benefit of a partner who was focused on Clem and capable of providing immediate assistance.

15

Moreover, Corbeau's reasons for opening fire were based on disputed facts.  Both Clem's wife and Corbeau's partner denied that Clem had either threatened the officers or made a gesture suggesting that he was armed.  Corbeau himself admitted that he "may have" known that the story about Clem threatening his wife with a knife was false.  Absent the disputed facts, a reasonable officer in Corbeau's position would not have believed that Clem posed an immediate threat of serious bodily harm.  Accordingly, we held that Corbeau was not entitled to qualified immunity at the summary judgment stage, and a trial was necessary to resolve the disputed facts.

The second case is Schultz v. Braga, 455 F.3d 470 (4th Cir. 2006).  Here, too, the court held that the defendant, an FBI agent, was not entitled to qualified immunity at the summary judgment stage.  In Schultz, a team of FBI agents, acting on a tip, staked out a 7-Eleven store.  They were looking for a notorious bank robber who, they were told, would be arriving in a red car driven by a red-headed woman.  The robber would be wearing a white baseball cap. During the stake-out, a red-headed woman in a red car drove into the parking lot.  Her passenger was a man wearing a white baseball cap. Although the agents did not know it at the time, the couple were entirely innocent youngsters who became victims of circumstance. The driver was 16-year-old Kristen Harkum ("Harkum"), and the passenger was her date, 20-year-old Joseph Schultz ("Schultz").

16

The agents followed the couple as they drove from the parking lot. A few minutes later, they forced the car to the side of the road. Four agents surrounded the car, guns drawn. Agent Stephen Stowe ("Stowe") approached the passenger side and ordered the couple to put their hands in the air. Harkum and Schultz obeyed. Then, in a loud voice, Stowe ordered Schultz to unlock the passenger-side door.

A split second later, Special Agent Christopher Braga ("Braga"), who was standing just a few feet from Stowe, opened fire on Schultz. Braga later claimed that Schultz had turned to the left and reached down, as if to grab something from between the seats. Harkum, Schultz, and Stowe all disagreed, testifying that Schultz had turned to the right to unlock the door, as ordered.

A reasonable officer in Braga's situation would have perceived the situation to be tense. Had Schultz, defying a peremptory command, moved his hands away from the door and towards the console, then a reasonable officer may well have made a split-second decision to shoot. The summary judgment standard, however, required the court to assume that Schultz was complying with the order, that his hands were in view, and that he was moving to unlock the door when Braga shot him. As in Clem, despite the tense circumstances, no reasonable officer operating under such assumptions would have used deadly force.

17

In the instant case, construing the facts in Alford's favor does not remove two salient perceptions that we must impute to a reasonable officer. First, that the situation was tense and volatile. Second, that Alford's hand was within inches of Windham's gun. We find that a reasonable officer, forced to make a quick decision, could have concluded that Alford posed an immediate threat of serious physical harm. Accordingly, Windham did not violate Alford's constitutional rights, and Windham is entitled to qualified immunity.

## III.

We turn next to Alford's state law claims against Windham for (1) assault and battery, (2) negligence, and (3) punitive damages.[10] The district court held that Windham was entitled to public official immunity under North Carolina law and dismissed these claims. Alford appeals this ruling.

As we have discussed, the qualified immunity analysis for excessive force claims under § 1983 examines the objective reasonableness of the officer's actions. We concluded that Windham was entitled to qualified immunity under this standard because a reasonable officer could have believed that Alford posed an immediate threat of physical harm. North Carolina's public official

---

[10]Alford did not mention his trespass claim against Windham in his opening brief. Accordingly, he has waived appeal of this claim. See Fed. R. App. P. 28(a)(9)(A).

immunity analysis, however, requires an inquiry into the subjective motivations of the official. See Andrews v. Crump, 144 N.C.App. 68, 76-77, 547 S.E.2d 117 (2001).

To qualify for public official immunity under North Carolina law, a police officer must "exercise[] the judgment and discretion with which he is invested . . ., keep[] within the scope of his official duty, and act[] without malice or corruption." Smith v. State, 289 N.C. 303, 331, 222 S.E.2d 412, 430 (1976).[11] According to Alford, Windham acted with malice when he shot "an unarmed man in cold blood."

Under North Carolina law, "[a] defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888,890-891 (1984). An action is wanton if "it is done with wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id.

In dismissing Alford's state law claims, the district court concluded that "Windham acted reasonably in light of the circumstances." The court did not consider, however, whether Windham acted with malice. Although the district court did not apply the proper standard for public official immunity under North

[11]See also Prior v. Pruett, 143 N.C.App. 612, 623-24, 550 S.E.2d 166, 173-74 (2001)(analyzing public official immunity in a police excessive force case).

19

Carolina law, we affirm the district court's ruling because Alford failed to create an issue of material fact as to malice.

Alford argues that Windham is not entitled to public official immunity because he "maliciously shot Appellant." (Appellant Br. at 48). Although Alford properly identifies "malice" as an element of the North Carolina test for public official immunity, his assessment offers no facts to support his conclusion.

To support his claim of malice, Alford speculates that, "[i]n all likelihood, Windham was upset at being denied access to the front door and decided to take out his frustrations on the first person he met in the residence." Mere speculation is insufficient to create an issue of material fact. JKC Holding Co. LLC v. Washington Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Alford failed to produce any evidence that Windham acted for any purpose other than to defend himself. Without such evidence, Alford has not created an issue of material fact as to whether Windham acted maliciously. Accordingly, Windham is entitled to public official immunity under North Carolina law.

IV.

Finally, we turn to Alford's claims against Butler. Because Alford failed to raise these claims on appeal, he has abandoned them.

20

Under Federal Rule of Appellate Procedure 28(a)(9)(a), the appellant's opening brief must include "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which appellant relies." "Failure to comply with the specific dictates of this rule with respect to a particular claim triggers abandonment of that claim on appeal." Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir. 1999).

Alford does mention his claims against Butler in his opening brief. He does so, however, in a mere two sentences that conclusorily contend that the lower court erred in dismissing those claims.[12] He failed to comply with Federal Rule of Appellate Procedure 28(a)(9)(a). Accordingly, he has waived his claims against Butler.

V.

For the foregoing reasons, we affirm the district court's grant of summary judgment to Windham.

AFFIRMED

---

[12] Alford's opening brief contains a section titled "Butler Can be Held Responsible for Windham's Actions." Alford's entire argument is as follows: "The district court granted summary judgment to Butler on Appellant's federal claims under 42 U.S.C. § 1983 and state law claims of respondeat superior and supervisory liability based on the court's holding that Windham acted objectively reasonable [sic] as a matter of law in shooting Appellant. Because this holding is erroneous, the federal and state law claims against Butler should be reinstated." (Appellant's Br. at 49.)

21

GREGORY, Circuit Judge, concurring in part and dissenting in part:

Today the majority affirms the district court's grant of summary judgment on Sergeant Cuyler Larue Windham, Jr.'s (Windham) qualified immunity claim. The majority concludes that Windham had probable cause to believe that Charles Alford (Alford) posed a threat of serious bodily harm or death because of the "volatile, threatening situation" he faced during the drug raid. (Majority Opinion, p. 14.) The majority holds that a reasonable officer in Windham's position could have believed his life would have been in danger had Windham taken the slightest moment to pause for reflection before firing, thereby justifying the use of deadly force. While I concur with the majority's articulation of the law on qualified immunity, I must dissent based upon their application of the facts to that law.

The threshold question in the qualified immunity calculus is whether the facts, viewed in the light most favorable to the plaintiff, demonstrate a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). More specifically, we must ask "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Elliot v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996). Without question, Windham and Alford have conflicting accounts of the events. However, at the summary judgment stage, the law requires us to construe all facts and "justifiable inferences" in the manner

22

most favorable to Alford. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

Unfortunately, the majority fails at this endeavor, at times resolving certain disputed facts in Windham's favor.[1] The majority also sets out a series of presumptions with which a reasonable police officer in Windham's position would have approached the trailer; yet, the majority considers only those presumptions favoring the officer, ignoring any that favor Alford.[2]

While I take issue with the majority's application of the material facts to the underlying law, they do a fine job of reiterating our primary undertaking at this stage: "[t]he task that the court must accomplish at the summary judgment stage is to reconstruct the record by resolving all factual disputes in plaintiff's favor." (Majority Opinion, p. 12.) With this standard

---

[1]For example, despite Alford's contention that he did not hear the officers' order to "Get down", the majority assumes that officers' recollection is accurate because the testimony of the officers and Alford's father concur.(Majority Opinion, p. 7, footnote 5.) In discussing what a reasonable officer would have observed as the raid occurred, the majority relies on the forensic report to support its contention that Windham was in serious peril. While the forensic report provides that Alford's forearm was no more than twelve inches from the muzzle of the machine pistol, that fact does not inevitably lead to or necessarily support the conclusion that Alford was acting aggressively. Indeed, there is clearly a material dispute of fact as to why Alford's arms were outstretched in the moment prior to the shooting.

[2]For example, a reasonable officer would have been aware that there were two children in the trailer, and that due to the close quarters of the trailer, extreme chaos was likely to ensue upon the officers' entry into the trailer. Taking these factors into account, a reasonable officer would have exercised an additional measure of prudence (however minute) prior to firing any weapons.

in mind, I find these are the salient facts: Alford, an unarmed guest in the trailer, was playing solitaire when the police officers entered. Alford was unaware that anyone had entered the trailer and did not hear the officers shouting "Get down." When Alford heard the sound generated by the grenade explosion, he ran into the kitchen, where he encountered his eight year-old niece Makayla screaming and running. Windham confronted Alford at this point. Alford never looked at or moved directly toward Windham. As Alford reached for his niece, Alford was hit by an unidentified officer, knocking him backward. As a result of the blow, Alford was stunned and knocked away from Windham. It was at this point, as Alford was stunned and falling away from Windham that Windham fired a three shot burst at Alford. At no point did Alford attempt to grab or jostle Windham's gun.

The Fourth Amendment requires that deadly force is only permissible when an officer has probable cause to feel that his physical health is in serious danger. See, e.g., Elliot v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996)("A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others."). Indeed, the protections of the Fourth Amendment are at their nadir when deadly force is used. See, e.g., Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002)("When deadly force is at issue, the Supreme Court has long recognized that the intrusion on Fourth Amendment

24

rights is unmatched."). While the chaotic nature of the overall drug raid provides Windham with some leeway, we must be careful to limit our focus to "the circumstances **at the moment** force was used..." Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001)(emphasis added).

The lynchpin of the majority's decision is the "uncontroverted" forensic report's conclusion that the muzzle of the pistol was no more than twelve inches from Alford's forearm when the shot was fired. (Majority Opinion, p. 6.) From this conclusion, the majority reasons that because the situation was tense and Alford's hand was within inches of the gun, "a reasonable officer, forced to make a quick decision, could have concluded that Alford posed an immediate threat of serious physical harm." (Majority Opinion, p. 18.)

I respectfully disagree. Based on the undisputed record, Windham saw Alford's arms outstretched. Alford claims (and we must believe) that his arms were outstretched because he was trying to pick up his niece, Makayla. (J.A. 358.) As Alford bent down to pick up Makayla, either Windham or a second officer hit Alford in the mouth, propelling him backward.[3] (J.A. 358.) Under either scenario,

---

[3]According to Alford, the officer immediately "grabbed" Makayla after striking him. (J.A. 361.) The officer's reaction (striking Alford and immediately thereafter picking up the child) provides further evidence that the officer recognized that Alford was trying to pick up the child, and not attack the officer. If the jury concluded Windham or another officer struck Alford, no reasonable officer in Windham's position would have found Alford's

25

during the split second when Windham made the decision to fire, Windham would have been aware that Alford was hit and falling away from him. Under such a circumstance, the fact that Alford's hand was close to Windham's gun would have been irrelevant because Alford would not have been able to threaten Windham's safety. Indeed, the short distance between Alford's hand and the gun may very well prove a "fact" that is, in the words of Don Quixote, "an enemy of truth." Dale Wasserman, Man of La Mancha 40 (1966).

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989). Although the severity of the alleged crime is indisputable, there is a material dispute over whether Alford posed a threat (and if so, how serious) to Windham at any point in their encounter. Finally, it is undisputed that Alford was not attempting to evade arrest by flight.

Overall, assuming Alford's version of what transpired on February 23, 2003, is correct, I cannot conclude, at this stage in the proceedings, that Windham's actions were reasonable under the

outstretched arms, whether they were falling backward or trying to grab Makayla, threatening.

Fourth Amendment.[4]  As the majority points out, qualified immunity can be applied after the trial in situations when, as here, a dispute of material fact precludes a definitive ruling on qualified immunity at the summary judgment stage.  (Majority Opinion, p. 9, footnote 7.)

I also disagree with the majority's conclusion in Part III. Even if Windham is not stripped of his qualified immunity, I do not see how this precludes liability under the North Carolina statute. According to North Carolina law, "[a] defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984).  This is in contrast with the threshold inquiry in the qualified immunity analysis which requires objectivity and "disregards the officer's motive." (Majority Opinion, p. 10.)  The majority's approach, in effect, provides a police officer with de facto immunity from all suits so long as he acted reasonably and without any outright indication that his actions were driven by malice. Unless a police officer surprisingly provided direct evidence of animus, he would never be found liable under the majority's interpretation of the North Carolina statute.

---

[4]Under the factual scenario alleged by Alford, I would also hold that the second prong of the Saucier inquiry is satisfied - i.e., it was clearly established that Windham's conduct was unlawful in the circumstances of the case.  Saucier v. Katz, 533 U.S. 194, 200-201 (2001).

This is a perverse result that counters any reasonable interpretation and application of the North Carolina statute. As with most claims involving malice, it is rare that the perpetrator expresses animus overtly; his intent must be gleaned through logical inferences and circumstantial evidence.

"To withstand a law enforcement officer's motion for summary judgment on the issue of individual capacity, plaintiffs must allege and forecast evidence demonstrating that the officers acted maliciously, corruptly, or beyond the scope of duty." Prior v. Pruett, 143 N.C. App. 612, 623, 550 S.E. 3d 166, 174-75 (2001). Alford alleges that Windham shot him despite the fact that he was unarmed, hit in the upper lip, and falling backward. Beyond his allegations, there is little more that Alford can do at this stage in order to bolster his case. In determining whether malice is present, conflicting factual scenarios are commonplace, leaving the jury with a credibility judgment. The two accounts of what transpired prior to the shooting are, charitably speaking, incompatible. If the jury were to disbelieve Windham's diametrically differing account of the events, and credit Alford's version of what occurred, there is little doubt that the jury could infer malice on the part of Windham.

Thus, I believe that Alford has satisfied his burden at this stage because a reasonable jury could find that Windham's actions were motivated by malice. I would vacate the district court's grant

of summary judgment as to the state law claims of negligence, assault and battery, and punitive damages.

As such, I respectfully dissent from Parts I, II, and III of the majority opinion. However, I concur in Part IV of the majority's opinion.